(Slip Opinion) OCTOBER TERM, 2017 1

NOTE: Where it is feasible, a syllabus (headnote) will be released, as is
being done in connection with this case, at the time the opinion is issued.
The syllabus constitutes no part of the opinion of the Court but has been
prepared by the Reporter of Decisions for the convenience of the reader.
See *United States* v. *Detroit Timber & Lumber Co.,* 200 U. S. 321, 337.

# SUPREME COURT OF THE UNITED STATES

Syllabus

## MINNESOTA VOTERS ALLIANCE ET AL. *v.* MANSKY ET AL.

### CERTIORARI TO THE UNITED STATES COURT OF APPEALS FOR THE EIGHTH CIRCUIT

No. 16–1435.   Argued February 28, 2018—Decided June 14, 2018

Minnesota law prohibits individuals, including voters, from wearing a
"political badge, political button, or other political insignia" inside a
polling place on Election Day.  Minn. Stat. §211B.11(1) (Supp. 2017).
This "political apparel ban" covers articles of clothing and accessories
with political insignia upon them.  State election judges have the au-
thority to decide whether a particular item falls within the ban.  Vio-
lators are subject to a civil penalty or prosecution for a petty misde-
meanor.

   Days before the November 2010 election, petitioner Minnesota Vot-
ers Alliance (MVA) and other plaintiffs challenged the ban in Federal
District Court on First Amendment grounds.  In response to the law-
suit, the State distributed an Election Day Policy to election officials
providing guidance on enforcement of the ban.  The Election Day Pol-
icy specified examples of prohibited apparel to include items display-
ing the name of a political party, items displaying the name of a can-
didate, items supporting or opposing a ballot question, "[i]ssue
oriented material designed to influence or impact voting," and
"[m]aterial promoting a group with recognizable political views."
App. to Pet. for Cert. I–1 to I–2.  On Election Day, some voters ran
into trouble with the ban, including petitioner Andrew Cilek, who al-
legedly was turned away from the polls for wearing a "Please I. D.
Me" button and a T-shirt bearing the words "Don't Tread on Me" and
a Tea Party Patriots logo.

   MVA and the other plaintiffs argued that the ban was unconstitu-
tional both on its face and as applied to their particular items of ap-
parel.  The District Court granted the State's motion to dismiss, and
the Eighth Circuit affirmed the dismissal of the facial challenge and

remanded the case for further proceedings on the as-applied chal-
lenge.  The District Court granted summary judgment to the State on
the as-applied challenge, and the Eighth Circuit affirmed.  MVA,
Cilek, and petitioner Susan Jeffers (collectively MVA) petitioned for
review of their facial First Amendment claim only.

*Held*: Minnesota's political apparel ban violates the Free Speech Clause
of the First Amendment.  Pp. 7–19.

   (a) Because the political apparel ban applies only in a specific loca-
tion—the interior of a polling place—it implicates the Court's "'forum
based' approach for assessing restrictions that the government seeks
to place on the use of its property."  *International Soc. for Krishna
Consciousness, Inc.* v. *Lee,* 505 U. S. 672, 678.  A polling place in
Minnesota qualifies as a nonpublic forum under the Court's prece-
dents.  As such it may be subject to content-based restrictions on
speech, see, *e.g.*, *Cornelius* v. *NAACP Legal Defense & Ed. Fund, Inc.,*
473 U. S. 788, 806–811, so long as the restrictions are "reasonable
and not an effort to suppress expression merely because public offi-
cials oppose the speaker's view," *Perry Ed. Assn.* v. *Perry Local Edu-
cators' Assn.,* 460 U. S. 37, 46.  Because the text of the statute makes
no distinction based on the speaker's political persuasion, the ques-
tion is whether the apparel ban is "reasonable in light of the purpose
served by the forum": voting.  *Cornelius*, 473 U. S., at 806.  Pp. 7–9.

   (b) Minnesota's prohibition on political apparel serves a permissi-
ble objective.  In *Burson* v. *Freeman,* 504 U. S. 191, the Court upheld
a Tennessee law imposing a 100-foot zone around polling place en-
trances in which no person could solicit votes, distribute campaign
materials, or "display . . . campaign posters, signs or other campaign
materials."  504 U. S., at 193–194 (plurality opinion).  In finding that
the law withstood even strict scrutiny, the *Burson* plurality—whose
analysis was endorsed by Justice Scalia's opinion concurring in the
judgment—emphasized the problems of fraud, voter intimidation,
confusion, and general disorder that had plagued polling places in the
past.  Against that historical backdrop, the plurality and Justice
Scalia upheld Tennessee's determination that a campaign-free zone
outside the polls was necessary to secure the advantages of the secret
ballot and protect the right to vote.

   MVA argues that *Burson* considered only active campaigning out-
side the polling place by campaign workers and others trying to en-
gage voters approaching the polls, while Minnesota's ban prohibits
passive self-expression by voters themselves when voting.  But alt-
hough the plurality and Justice Scalia in *Burson* did not expressly
address the application of the Tennessee law to apparel—or consider
the interior of the polling place as opposed to its environs—the Ten-
nessee law swept broadly to ban even the plain "display" of a cam-

paign-related message, and the *Burson* Court upheld the law in full. The plurality's conclusion that the State was warranted in designating an area for the voters as "their own" as they enter the polling place, *id.,* at 210, suggests an interest more significant, not less, within that place.

No basis exists for rejecting Minnesota's determination that some forms of campaign advocacy should be excluded from the polling place in order to set it aside as "an island of calm in which voters can peacefully contemplate their choices." Brief for Respondents 43. Casting a vote is a weighty civic act, and the State may reasonably decide that the interior of the polling place should reflect the distinction between voting and campaigning. And while the Court has noted the "nondisruptive" nature of expressive apparel in more mundane settings, see, *e.g., Board of Airport Comm'rs of Los Angeles* v. *Jews for Jesus, Inc.*, 482 U. S. 569, 576, those observations do not speak to the unique context of a polling place on Election Day. Pp. 9–12.

(c) But the line the State draws must be reasonable. The State therefore must be able to articulate some sensible basis for distinguishing what may come in from what must stay out. The unmoored use of the term "political" in the Minnesota law, combined with haphazard interpretations the State has provided in official guidance and representations to this Court, cause Minnesota's restriction to fail this test.

The statute does not define the term "political," a word that can broadly encompass anything "of or relating to government, a government, or the conduct of governmental affairs." Webster's Third New International Dictionary 1755. The State argues that the apparel ban should be interpreted more narrowly to proscribe "only words and symbols that an objectively reasonable observer would perceive as conveying a message about the electoral choices at issue in [the] polling place." Brief for Respondents 13. At the same time, the State argues that the category of "political" apparel is not limited to campaign apparel.

The Court considers a State's authoritative constructions in interpreting a state law. But far from clarifying the indeterminate scope of the provision, Minnesota's "electoral choices" construction introduces confusing line-drawing problems. For specific examples of what messages are banned under that standard, the State points to the Election Day Policy. The first three categories of prohibited items in the Policy are clear. But the next category—"issue oriented material designed to influence or impact voting"—raises more questions than it answers. The State takes the position that any subject on which a political candidate or party has taken a stance qualifies as an "issue" within the meaning of that category. Such a rule—whose

Syllabus

fair enforcement requires an election judge to maintain a mental in-
dex of the platforms and positions of every candidate and party on
the ballot—is not reasonable.

   The next broad category in the Election Day Policy—any item
"promoting a group with recognizable political views"—makes mat-
ters worse.  The State does not confine that category to groups that
have endorsed a candidate or taken a position on a ballot question.
As a result, any number of associations, educational institutions,
businesses, and religious organizations could have an opinion on an
"issue confronting voters."  The State represents that the ban is lim-
ited to apparel promoting groups with "well-known" political posi-
tions.  But that requirement only increases the potential for erratic
application, as its enforcement may turn in significant part on the
background knowledge of the particular election judge applying it.

   It is "self-evident" that an indeterminate prohibition carries with it
"[t]he opportunity for abuse, especially where [it] has received a vir-
tually open-ended interpretation."  *Jews for Jesus*, 482 U. S., at 576.
The discretion election judges exercise in enforcing the ban must be
guided by objective, workable standards.  Without them, an election
judge's own politics may shape his views on what counts as "politi-
cal."  And if voters experience or witness episodes of unfair or incon-
sistent enforcement of the ban, the State's interest in maintaining a
polling place free of distraction and disruption would be undermined
by the very measure intended to further it.  Thus, if a State wishes to
set its polling places apart as areas free of partisan discord, it must
employ a more discernible approach than the one offered by Minneso-
ta here.  Pp. 12–19.

849 F. 3d 749, reversed and remanded.

   ROBERTS, C. J., delivered the opinion of the Court, in which KENNEDY,
THOMAS, GINSBURG, ALITO, KAGAN, and GORSUCH, JJ., joined.  SO-
TOMAYOR, J., filed a dissenting opinion, in which BREYER, J., joined.

NOTICE: This opinion is subject to formal revision before publication in the preliminary print of the United States Reports. Readers are requested to notify the Reporter of Decisions, Supreme Court of the United States, Washington, D. C. 20543, of any typographical or other formal errors, in order that corrections may be made before the preliminary print goes to press.

# SUPREME COURT OF THE UNITED STATES

————

No. 16–1435

————

## MINNESOTA VOTERS ALLIANCE, ET AL., PETITIONERS *v.* JOE MANSKY, ET AL.

### ON WRIT OF CERTIORARI TO THE UNITED STATES COURT OF APPEALS FOR THE EIGHTH CIRCUIT

[June 14, 2018]

CHIEF JUSTICE ROBERTS delivered the opinion of the Court.

Under Minnesota law, voters may not wear a political badge, political button, or anything bearing political insignia inside a polling place on Election Day. The question presented is whether this ban violates the Free Speech Clause of the First Amendment.

I

A

Today, Americans going to their polling places on Election Day expect to wait in a line, briefly interact with an election official, enter a private voting booth, and cast an anonymous ballot. Little about this ritual would have been familiar to a voter in the mid-to-late nineteenth century. For one thing, voters typically deposited privately prepared ballots at the polls instead of completing official ballots on-site. These pre-made ballots often took the form of "party tickets"—printed slates of candidate selections, often distinctive in appearance, that political parties distributed to their supporters and pressed upon others around the polls. See E. Evans, A History of the

Australian Ballot System in the United States 6–11 (1917) (Evans); R. Bensel, The American Ballot Box in the Mid-Nineteenth Century 14–15 (2004) (Bensel).

The physical arrangement confronting the voter was also different. The polling place often consisted simply of a "voting window" through which the voter would hand his ballot to an election official situated in a separate room with the ballot box. Bensel 11, 13; see, *e.g.,* C. Rowell, Digest of Contested-Election Cases in the Fifty-First Congress 224 (1891) (report of Rep. Lacey) (considering whether "the ability to reach the window and actually tender the ticket to the [election] judges" is "essential in all cases to constitute a good offer to vote"); Holzer, Election Day 1860, Smithsonian Magazine (Nov. 2008), pp. 46, 52 (describing the interior voting window on the third floor of the Springfield, Illinois courthouse where Abraham Lincoln voted). As a result of this arrangement, "the actual act of voting was usually performed in the open," frequently within view of interested onlookers. Rusk, The Effect of the Australian Ballot Reform on Split Ticket Voting: 1876–1908, Am. Pol. Sci. Rev. 1220, 1221 (1970) (Rusk); see Evans 11–13.

As documented in *Burson* v. *Freeman*, 504 U. S. 191 (1992), "[a]pproaching the polling place under this system was akin to entering an open auction place." *Id.,* at 202 (plurality opinion). The room containing the ballot boxes was "usually quiet and orderly," but "[t]he public space outside the window . . . was chaotic." Bensel 13. Electioneering of all kinds was permitted. See *id.*, at 13, 16–17; R. Dinkin, Election Day: A Documentary History 19 (2002). Crowds would gather to heckle and harass voters who appeared to be supporting the other side. Indeed, "[u]nder the informal conventions of the period, election etiquette required only that a 'man of ordinary courage' be able to make his way to the voting window." Bensel 20–21. "In short, these early elections were not a very pleasant spec-

tacle for those who believed in democratic government." *Burson,* 504 U. S., at 202 (plurality opinion) (internal quotation marks omitted).

By the late nineteenth century, States began implementing reforms to address these vulnerabilities and improve the reliability of elections. Between 1888 and 1896, nearly every State adopted the secret ballot. See *id.,* at 203–205. Because voters now needed to mark their state-printed ballots on-site and in secret, voting moved into a sequestered space where the voters could "deliberate and make a decision in . . . privacy." Rusk 1221; see Evans 35; 1889 Minn. Stat. ch. 3, §§27–28, p. 21 (regulating, as part of Minnesota's secret ballot law, the arrangement of voting compartments inside the polling place). In addition, States enacted "viewpoint-neutral restrictions on election-day speech" in the immediate vicinity of the polls. *Burson,* 504 U. S., at 214–215 (Scalia, J., concurring in judgment) (by 1900, 34 of 45 States had such restrictions). Today, all 50 States and the District of Columbia have laws curbing various forms of speech in and around polling places on Election Day.

Minnesota's such law contains three prohibitions, only one of which is challenged here. See Minn. Stat. §211B.11(1) (Supp. 2017). The first sentence of §211B.11(1) forbids any person to "display campaign material, post signs, ask, solicit, or in any manner try to induce or persuade a voter within a polling place or within 100 feet of the building in which a polling place is situated" to "vote for or refrain from voting for a candidate or ballot question." The second sentence prohibits the distribution of "political badges, political buttons, or other political insignia to be worn at or about the polling place." The third sentence—the "political apparel ban"—states that a "political badge, political button, or other political insignia may not be worn at or about the polling place." Versions of all three prohibitions have been on the books

in Minnesota for over a century. See 1893 Minn. Laws ch. 4, §108, pp. 51–52; 1912 Minn. Laws, 1st Spec. Sess., ch. 3, p. 24; 1988 Minn. Laws ch. 578, Art. 3, §11, p. 594 (reenacting the prohibitions as part of §211B.11).

There is no dispute that the political apparel ban applies only *within* the polling place, and covers articles of clothing and accessories with "political insignia" upon them. Minnesota election judges—temporary government employees working the polls on Election Day—have the authority to decide whether a particular item falls within the ban. App. to Pet. for Cert. I–1. If a voter shows up wearing a prohibited item, the election judge is to ask the individual to conceal or remove it. *Id.,* at I–2. If the individual refuses, the election judge must allow him to vote, while making clear that the incident "will be recorded and referred to appropriate authorities." *Ibid.* Violators are subject to an administrative process before the Minnesota Office of Administrative Hearings, which, upon finding a violation, may issue a reprimand or impose a civil penalty. Minn. Stat. §§211B.32, 211B.35(2) (2014). That administrative body may also refer the complaint to the county attorney for prosecution as a petty misdemeanor; the maximum penalty is a $300 fine. §§211B.11(4) (Supp. 2017), 211B.35(2) (2014), 609.02(4a) (2016).

B

Petitioner Minnesota Voters Alliance (MVA) is a nonprofit organization that "seeks better government through election reforms." Pet. for Cert. 5. Petitioner Andrew Cilek is a registered voter in Hennepin County and the executive director of MVA; petitioner Susan Jeffers served in 2010 as a Ramsey County election judge. Five days before the November 2010 election, MVA, Jeffers, and other likeminded groups and individuals filed a lawsuit in Federal District Court challenging the political apparel ban on First Amendment grounds. The groups—calling

themselves "Election Integrity Watch" (EIW)—planned to
have supporters wear buttons to the polls printed with the
words "Please I. D. Me," a picture of an eye, and a tele-
phone number and web address for EIW. (Minnesota law
does not require individuals to show identification to vote.)
One of the individual plaintiffs also planned to wear a
"Tea Party Patriots" shirt. The District Court denied the
plaintiffs' request for a temporary restraining order and
preliminary injunction and allowed the apparel ban to
remain in effect for the upcoming election.

In response to the lawsuit, officials for Hennepin and
Ramsey Counties distributed to election judges an "Elec-
tion Day Policy," providing guidance on the enforcement of
the political apparel ban. The Minnesota Secretary of
State also distributed the Policy to election officials
throughout the State. The Policy specified that examples
of apparel falling within the ban "include, but are not
limited to":

"• Any item including the name of a political party in
Minnesota, such as the Republican, [Democratic-
Farmer-Labor], Independence, Green or Libertar-
ian parties.

• Any item including the name of a candidate at any
election.

• Any item in support of or opposition to a ballot
question at any election.

• Issue oriented material designed to influence or
impact voting (including specifically the 'Please
I. D. Me' buttons).

• Material promoting a group with recognizable po-
litical views (such as the Tea Party, MoveOn.org,
and so on)." App. to Pet. for Cert. I–1 to I–2.

As alleged in the plaintiffs' amended complaint and

supporting declarations, some voters associated with EIW
ran into trouble with the ban on Election Day. One indi-
vidual was asked to cover up his Tea Party shirt. Another
refused to conceal his "Please I. D. Me" button, and an
election judge recorded his name and address for possible
referral. And petitioner Cilek—who was wearing the
same button and a T-shirt with the words "Don't Tread on
Me" and the Tea Party Patriots logo—was twice turned
away from the polls altogether, then finally permitted to
vote after an election judge recorded his information.

Back in court, MVA and the other plaintiffs (now joined
by Cilek) argued that the ban was unconstitutional both
on its face and as applied to their apparel. The District
Court granted the State's motions to dismiss, and the
Court of Appeals for the Eighth Circuit affirmed in part
and reversed in part. *Minnesota Majority* v. *Mansky*, 708
F. 3d 1051 (2013). In evaluating MVA's facial challenge,
the Court of Appeals observed that this Court had previ-
ously upheld a state law restricting speech "related to a
political campaign" in a 100-foot zone outside a polling
place; the Court of Appeals determined that Minnesota's
law likewise passed constitutional muster. *Id.,* at 1056–
1058 (quoting *Burson*, 504 U. S., at 197 (plurality opin-
ion)). The Court of Appeals reversed the dismissal of the
plaintiffs' as-applied challenge, however, finding that the
District Court had improperly considered matters outside
the pleadings. 708 F. 3d, at 1059. Judge Shepherd con-
curred in part and dissented in part. In his view, Minne-
sota's broad restriction on political apparel did not "ra-
tionally and reasonably" serve the State's asserted
interests. *Id.,* at 1062. On remand, the District Court
granted summary judgment for the State on the as-
applied challenge, and this time the Court of Appeals
affirmed. *Minnesota Majority* v. *Mansky*, 849 F. 3d 749
(2017).

MVA, Cilek, and Jeffers (hereinafter MVA) petitioned

for review of their facial First Amendment claim only. We granted certiorari. 583 U. S. \_\_\_ (2017).

## II

The First Amendment prohibits laws "abridging the freedom of speech." Minnesota's ban on wearing any "political badge, political button, or other political insignia" plainly restricts a form of expression within the protection of the First Amendment.

But the ban applies only in a specific location: the interior of a polling place. It therefore implicates our "'forum based' approach for assessing restrictions that the government seeks to place on the use of its property." *International Soc. for Krishna Consciousness, Inc.* v. *Lee*, 505 U. S. 672, 678 (1992) (*ISKCON*). Generally speaking, our cases recognize three types of government-controlled spaces: traditional public forums, designated public forums, and nonpublic forums. In a traditional public forum—parks, streets, sidewalks, and the like—the government may impose reasonable time, place, and manner restrictions on private speech, but restrictions based on content must satisfy strict scrutiny, and those based on viewpoint are prohibited. See *Pleasant Grove City* v. *Summum*, 555 U. S. 460, 469 (2009). The same standards apply in designated public forums—spaces that have "not traditionally been regarded as a public forum" but which the government has "intentionally opened up for that purpose." *Id.,* at 469–470. In a nonpublic forum, on the other hand—a space that "is not by tradition or designation a forum for public communication"—the government has much more flexibility to craft rules limiting speech. *Perry Ed. Assn.* v. *Perry Local Educators' Assn.*, 460 U. S. 37, 46 (1983). The government may reserve such a forum "for its intended purposes, communicative or otherwise, as long as the regulation on speech is reasonable and not an effort to suppress expression merely because public offi-

cials oppose the speaker's view." *Ibid.*

This Court employs a distinct standard of review to assess speech restrictions in nonpublic forums because the government, "no less than a private owner of property," retains the "power to preserve the property under its control for the use to which it is lawfully dedicated." *Adderley* v. *Florida*, 385 U. S. 39, 47 (1966). "Nothing in the Constitution requires the Government freely to grant access to all who wish to exercise their right to free speech on every type of Government property without regard to the nature of the property or to the disruption that might be caused by the speaker's activities." *Cornelius* v. *NAACP Legal Defense & Ed. Fund, Inc.*, 473 U. S. 788, 799–800 (1985). Accordingly, our decisions have long recognized that the government may impose some content-based restrictions on speech in nonpublic forums, including restrictions that exclude political advocates and forms of political advocacy. See *id.,* at 806–811; *Greer* v. *Spock*, 424 U. S. 828, 831–833, 838–839 (1976); *Lehman* v. *Shaker Heights*, 418 U. S. 298, 303–304 (1974) (plurality opinion); *id.,* at 307–308 (Douglas, J., concurring in judgment).

A polling place in Minnesota qualifies as a nonpublic forum. It is, at least on Election Day, government-controlled property set aside for the sole purpose of voting. The space is "a special enclave, subject to greater restriction." *ISKCON*, 505 U. S., at 680. Rules strictly govern who may be present, for what purpose, and for how long. See Minn. Stat. §204C.06 (2014). And while the four-Justice plurality in *Burson* and Justice Scalia's concurrence in the judgment parted ways over whether the public sidewalks and streets *surrounding* a polling place qualify as a nonpublic forum, neither opinion suggested that the interior of the building was anything but. See 504 U. S., at 196–197, and n. 2 (plurality opinion); *id.*, at 214–216 (opinion of Scalia, J.).

We therefore evaluate MVA's First Amendment chal-

lenge under the nonpublic forum standard. The text of the apparel ban makes no distinction based on the speaker's political persuasion, so MVA does not claim that the ban discriminates on the basis of viewpoint on its face. The question accordingly is whether Minnesota's ban on political apparel is "reasonable in light of the purpose served by the forum": voting. *Cornelius*, 473 U. S., at 806.

## III

### A

We first consider whether Minnesota is pursuing a permissible objective in prohibiting voters from wearing particular kinds of expressive apparel or accessories while inside the polling place. The natural starting point for evaluating a First Amendment challenge to such a restriction is this Court's decision in *Burson*, which upheld a Tennessee law imposing a 100-foot campaign-free zone around polling place entrances. Under the Tennessee law—much like Minnesota's buffer-zone provision—no person could solicit votes for or against a candidate, party, or ballot measure, distribute campaign materials, or "display . . . campaign posters, signs or other campaign materials" within the restricted zone. 504 U. S., at 193–194 (plurality opinion). The plurality found that the law withstood even the strict scrutiny applicable to speech restrictions in traditional public forums. *Id.,* at 211. In his opinion concurring in the judgment, Justice Scalia argued that the less rigorous "reasonableness" standard of review should apply, and found the law "at least reasonable" in light of the plurality's analysis. *Id.*, at 216.

That analysis emphasized the problems of fraud, voter intimidation, confusion, and general disorder that had plagued polling places in the past. See *id.,* at 200–204 (plurality opinion). Against that historical backdrop, the plurality and Justice Scalia upheld Tennessee's determination, supported by overwhelming consensus among the

States and "common sense," that a campaign-free zone outside the polls was "necessary" to secure the advantages of the secret ballot and protect the right to vote. *Id.,* at 200, 206–208, 211. As the plurality explained, "[t]he State of Tennessee has decided that [the] last 15 seconds before its citizens enter the polling place should be their own, as free from interference as possible." *Id.,* at 210. That was not "an unconstitutional choice." *Ibid.*

MVA disputes the relevance of *Burson* to Minnesota's apparel ban. On MVA's reading, *Burson* considered only "active campaigning" outside the polling place by campaign workers and others trying to engage voters approaching the polls. Brief for Petitioners 36–37. Minnesota's law, by contrast, prohibits what MVA characterizes as "passive, silent" self-expression by voters themselves when voting. Reply Brief 17. MVA also points out that the plurality focused on the extent to which the restricted zone combated "voter intimidation and election fraud," 504 U. S., at 208—concerns that, in MVA's view, have little to do with a prohibition on certain types of voter apparel.

Campaign buttons and apparel did come up in the *Burson* briefing and argument, but neither the plurality nor Justice Scalia expressly addressed such applications of the law.[1] Nor did either opinion specifically consider the

_____

[1] The State of Tennessee represented that its prohibition on campaign displays extended both to items of apparel and to voters. Tr. of Oral Arg. in No. 90–1056, p. 33 (argument of Atty. Gen. Burson) (explaining that the statute banned "[t]ee-shirts," "campaign buttons," and "hats" because such items "implicate and invite the same problems," and that voters would be "asked to take campaign button[s] off as they go in"); see Brief for State of Tennessee et al. as *Amici Curiae* 3, 28–30, and n. 3 (making the same representation in the present case). The *Burson* plaintiff also emphasized that the Tennessee law would cover apparel, including apparel worn by voters, see Brief for Respondent in No. 90–1056, p. 3; Tr. of Oral Arg. in No. 90–1056, p. 21, and Justice Stevens in dissent referred to the application of the law to campaign buttons, see *Burson,* 504 U. S., at 218–219, 224.

interior of the polling place as opposed to its environs, and it is true that the plurality's reasoning focused on campaign activities of a sort not likely to occur in an area where, for the most part, only voters are permitted while voting. At the same time, Tennessee's law swept broadly to ban even the plain "display" of a campaign-related message, and the Court upheld the law in full. The plurality's conclusion that the State was warranted in designating an area for the voters as "their own" as they *enter* the polling place suggests an interest more significant, not less, *within* that place. *Id.,* at 210.

In any event, we see no basis for rejecting Minnesota's determination that some forms of advocacy should be excluded from the polling place, to set it aside as "an island of calm in which voters can peacefully contemplate their choices." Brief for Respondents 43. Casting a vote is a weighty civic act, akin to a jury's return of a verdict, or a representative's vote on a piece of legislation. It is a time for choosing, not campaigning. The State may reasonably decide that the interior of the polling place should reflect that distinction.

To be sure, our decisions have noted the "nondisruptive" nature of expressive apparel in more mundane settings. *Board of Airport Comm'rs of Los Angeles* v. *Jews for Jesus, Inc.*, 482 U. S. 569, 576 (1987) (so characterizing "the wearing of a T-shirt or button that contains a political message" in an airport); *Tinker* v. *Des Moines Independent Community School Dist.*, 393 U. S. 503, 508 (1969) (students wearing black armbands to protest the Vietnam War engaged in "silent, passive expression of opinion, unaccompanied by any disorder or disturbance"). But those observations do not speak to the unique context of a polling place on Election Day. Members of the public are brought together at that place, at the end of what may have been a divisive election season, to reach considered decisions about their government and laws. The State

may reasonably take steps to ensure that partisan discord not follow the voter up to the voting booth, and distract from a sense of shared civic obligation at the moment it counts the most. That interest may be thwarted by displays that do not raise significant concerns in other situations.

Other States can see the matter differently, and some do.[2] The majority, however, agree with Minnesota that at least some kinds of campaign-related clothing and accessories should stay outside.[3] That broadly shared judgment is entitled to respect. Cf. *Burson*, 504 U. S., at 206 (plurality opinion) (finding that a "widespread and time-tested consensus" supported the constitutionality of campaign buffer zones).

Thus, in light of the special purpose of the polling place itself, Minnesota may choose to prohibit certain apparel there because of the message it conveys, so that voters may focus on the important decisions immediately at hand.

B

But the State must draw a reasonable line. Although there is no requirement of narrow tailoring in a nonpublic forum, the State must be able to articulate some sensible

---

[2] See, *e.g.,* Ala. Secretary of State, 2018 Alabama Voter Guide 14 (voters may wear "campaign buttons or T-shirts with political advertisements"); 2018 Va. Acts ch. 700, §1 (prohibitions on exhibiting campaign material "shall not be construed" to prohibit a voter "from wearing a shirt, hat, or other apparel on which a candidate's name or a political slogan appears or from having a sticker or button attached to his apparel on which a candidate's name or a political slogan appears"); R. I. Bd. of Elections, Rules and Regulations for Polling Place Conduct 3 (2016) (voters may "display or wear any campaign or political party button, badge or other document or item designed or tending to aid, injure or defeat any candidate for public office or any political party or any question," but they must "immediately exit the polling location without unreasonable delay" after voting).

[3] See Appendix, *infra.*

basis for distinguishing what may come in from what must stay out. See *Cornelius*, 473 U. S., at 808–809. Here, the unmoored use of the term "political" in the Minnesota law, combined with haphazard interpretations the State has provided in official guidance and representations to this Court, cause Minnesota's restriction to fail even this for-giving test.

Again, the statute prohibits wearing a "political badge, political button, or other political insignia." It does not define the term "political." And the word can be expan-sive. It can encompass anything "of or relating to govern-ment, a government, or the conduct of governmental af-fairs," Webster's Third New International Dictionary 1755 (2002), or anything "[o]f, relating to, or dealing with the structure or affairs of government, politics, or the state," American Heritage Dictionary 1401 (3d ed. 1996). Under a literal reading of those definitions, a button or T-shirt merely imploring others to "Vote!" could qualify.

The State argues that the apparel ban should not be read so broadly. According to the State, the statute does not prohibit "any conceivably 'political' message" or cover "all 'political' speech, broadly construed." Brief for Re-spondents 21, 23. Instead, the State interprets the ban to proscribe "only words and symbols that an objectively reasonable observer would perceive as conveying a mes-sage about the electoral choices at issue in [the] polling place." *Id.,* at 13; see *id.,* at 19 (the ban "applies not to *any* message regarding government or its affairs, but to mes-sages relating to questions of governmental affairs facing voters on a given election day").

At the same time, the State argues that the category of "political" apparel is *not* limited to campaign apparel. After all, the reference to "campaign material" in the first sentence of the statute—describing what one may not "display" in the buffer zone as well as inside the polling place—implies that the distinct term "political" should be

understood to cover a broader class of items. As the State's counsel explained to the Court, Minnesota's law "expand[s] the scope of what is prohibited from campaign speech to additional political speech." Tr. of Oral Arg. 50.

We consider a State's "authoritative constructions" in interpreting a state law. *Forsyth County* v. *Nationalist Movement*, 505 U. S. 123, 131 (1992). But far from clarifying the indeterminate scope of the political apparel provision, the State's "electoral choices" construction introduces confusing line-drawing problems. Cf. *Jews for Jesus,* 482 U. S., at 575–576 (a resolution banning all "First Amendment activities" in an airport could not be saved by a "murky" construction excluding "airport-related" activity).

For specific examples of what is banned under its standard, the State points to the 2010 Election Day Policy—which it continues to hold out as authoritative guidance regarding implementation of the statute. See Brief for Respondents 22–23. The first three examples in the Policy are clear enough: items displaying the name of a political party, items displaying the name of a candidate, and items demonstrating "support of or opposition to a ballot question." App. to Pet. for Cert. I–2.

But the next example—"[i]ssue oriented material designed to influence or impact voting," *id.,* at I–2—raises more questions than it answers. What qualifies as an "issue"? The answer, as far as we can tell from the State's briefing and argument, is any subject on which a political candidate or party has taken a stance. See Tr. of Oral Arg. 37 (explaining that the "electoral choices" test looks at the "issues that have been raised" in a campaign "that are relevant to the election"). For instance, the Election Day Policy specifically notes that the "Please I. D. Me" buttons are prohibited. App. to Pet. for Cert. I–2. But a voter identification requirement was not on the ballot in 2010, see Brief for Respondents 47, n. 24, so a Minnesotan would have had no explicit "electoral choice" to make in

that respect. The buttons were nonetheless covered, the State tells us, because the Republican candidates for Governor and Secretary of State had staked out positions on whether photo identification should be required. *Ibid.*; see App. 58–60.[4]

A rule whose fair enforcement requires an election judge to maintain a mental index of the platforms and positions of every candidate and party on the ballot is not reasonable. Candidates for statewide and federal office and major political parties can be expected to take positions on a wide array of subjects of local and national import. See, *e.g.,* Democratic Platform Committee, 2016 Democratic Party Platform (approved July 2016) (stating positions on over 90 issues); Republican Platform Committee, Republican Platform 2016 (approved July 2016) (similar). Would a "Support Our Troops" shirt be banned, if one of the candidates or parties had expressed a view on military funding or aid for veterans? What about a "#MeToo" shirt, referencing the movement to increase awareness of sexual harassment and assault? At oral argument, the State indicated that the ban would cover such an item if a candidate had "brought up" the topic. Tr. of Oral Arg. 64–65.

The next broad category in the Election Day Policy—any item "promoting a group with recognizable political views," App. to Pet. for Cert. I–2—makes matters worse. The State construes the category as limited to groups with "views" about "the issues confronting voters in a given election." Brief for Respondents 23. The State does not,

---

[4] The State also maintains that the "Please I. D. Me" buttons were properly banned because the buttons were designed to confuse other voters about whether they needed photo identification to vote. Brief for Respondents 46–47. We do not doubt that the State may prohibit messages intended to mislead voters about voting requirements and procedures. But that interest does not align with the State's construction of "political" to refer to messages "about the electoral choices at issue in [the] polling place." *Id.,* at 13.

however, confine that category to groups that have endorsed a candidate or taken a position on a ballot question.

Any number of associations, educational institutions, businesses, and religious organizations could have an opinion on an "issue[] confronting voters in a given election." For instance, the American Civil Liberties Union, the AARP, the World Wildlife Fund, and Ben & Jerry's all have stated positions on matters of public concern.[5] If the views of those groups align or conflict with the position of a candidate or party on the ballot, does that mean that their insignia are banned? See *id.,* at 24, n. 15 (representing that "AFL–CIO or Chamber of Commerce apparel" would be banned if those organizations "had objectively recognizable views on an issue in the election at hand"). Take another example: In the run-up to the 2012 election, Presidential candidates of both major parties issued public statements regarding the then-existing policy of the Boy Scouts of America to exclude members on the basis of sexual orientation.[6] Should a Scout leader in 2012 stopping to vote on his way to a troop meeting have been asked

---

[5] See, *e.g.,* American Civil Liberties Union, Campaign for Smart Justice (2018), online at http://www.aclu.org/issues/mass-incarceration/smart-justice/campaign-smart-justice (taking positions on criminal justice reform) (all Internet materials as last visited June 11, 2018); AARP, Government & Elections, online at https://www.aarp.org/politics-society/government-elections/ (listing positions on Social Security and health care); World Wildlife Fund, A Win on Capitol Hill (Apr. 17, 2018), online at https://www.worldwildlife.org/stories/a-win-on-capitol-hill (describing the organization's position on federal funding for international conservation programs); Ben & Jerry's, Issues We Care About, online at https://www.benjerry.com/values/issues-we-care-about (sharing the corporation's views on campaign finance reform, international conflict, and civil rights).

[6] C. Camia, Obama, Romney Opposed to Boy Scouts Ban on Gays, USA Today OnPolitics (updated Aug. 08, 2012), online at http://content.usatoday.com/communities/onpolitics/post/2012/08/barack-obama-boy-scouts-gays-mitt-romney-/1.

to cover up his uniform?

The State emphasizes that the ban covers only apparel promoting groups whose political positions are sufficiently "well-known." Tr. of Oral Arg. 37. But that requirement, if anything, only increases the potential for erratic application. Well known by whom? The State tells us the lodestar is the "typical observer" of the item. Brief for Respondents 21. But that measure may turn in significant part on the background knowledge and media consumption of the particular election judge applying it.

The State's "electoral choices" standard, considered together with the nonexclusive examples in the Election Day Policy, poses riddles that even the State's top lawyers struggle to solve. A shirt declaring "All Lives Matter," we are told, could be "perceived" as political. Tr. of Oral Arg. 41. How about a shirt bearing the name of the National Rifle Association? Definitely out. *Id.*, at 39–40. That said, a shirt displaying a rainbow flag could be worn "*unless* there was an issue on the ballot" that "related somehow . . . to gay rights." *Id.*, at 38 (emphasis added). A shirt simply displaying the text of the Second Amendment? Prohibited. *Id.*, at 40. But a shirt with the text of the *First* Amendment? "It would be allowed." *Ibid.*

"[P]erfect clarity and precise guidance have never been required even of regulations that restrict expressive activity." *Ward* v. *Rock Against Racism*, 491 U. S. 781, 794 (1989). But the State's difficulties with its restriction go beyond close calls on borderline or fanciful cases. And that is a serious matter when the whole point of the exercise is to prohibit the expression of political views.

It is "self-evident" that an indeterminate prohibition carries with it "[t]he opportunity for abuse, especially where [it] has received a virtually open-ended interpretation." *Jews for Jesus*, 482 U. S., at 576; see *Heffron* v. *International Soc. for Krishna Consciousness, Inc.*, 452 U. S. 640, 649 (1981) (warning of the "more covert forms of

discrimination that may result when arbitrary discretion is vested in some governmental authority"). Election judges "have the authority to decide what is political" when screening individuals at the entrance to the polls. App. to Pet. for Cert. I–1. We do not doubt that the vast majority of election judges strive to enforce the statute in an evenhanded manner, nor that some degree of discretion in this setting is necessary. But that discretion must be guided by objective, workable standards. Without them, an election judge's own politics may shape his views on what counts as "political." And if voters experience or witness episodes of unfair or inconsistent enforcement of the ban, the State's interest in maintaining a polling place free of distraction and disruption would be undermined by the very measure intended to further it.

That is not to say that Minnesota has set upon an impossible task. Other States have laws proscribing displays (including apparel) in more lucid terms. See, *e.g.,* Cal. Elec. Code Ann. §319.5 (West Cum. Supp. 2018) (prohibiting "the visible display . . . of information that advocates for or against any candidate or measure," including the "display of a candidate's name, likeness, or logo," the "display of a ballot measure's number, title, subject, or logo," and "[b]uttons, hats," or "shirts" containing such information); Tex. Elec. Code Ann. §61.010(a) (West 2010) (prohibiting the wearing of "a badge, insignia, emblem, or other similar communicative device relating to a candidate, measure, or political party appearing on the ballot, or to the conduct of the election"). We do not suggest that such provisions set the outer limit of what a State may proscribe, and do not pass on the constitutionality of laws that are not before us. But we do hold that if a State wishes to set its polling places apart as areas free of partisan discord, it must employ a more discernible approach

than the one Minnesota has offered here.[7]

\*    \*    \*

Cases like this "present[] us with a particularly difficult reconciliation: the accommodation of the right to engage in political discourse with the right to vote." *Burson*, 504 U. S., at 198 (plurality opinion). Minnesota, like other States, has sought to strike the balance in a way that affords the voter the opportunity to exercise his civic duty in a setting removed from the clamor and din of electioneering. While that choice is generally worthy of our respect, Minnesota has not supported its good intentions with a law capable of reasoned application.

The judgment of the Court of Appeals is reversed, and the case is remanded for further proceedings consistent with this opinion.

*It is so ordered.*

———————

[7] The State argues that, in the event this Court concludes that there is a "substantial question" about the proper interpretation of §211B.11(1), we should postpone our decision and certify that issue to the Minnesota Supreme Court. Brief for Respondents 57; see Minn. Stat. §480.065(3) (2016). The dissent takes up this cause as well. See *post,* at 1 (opinion of SOTOMAYOR, J.). The decision to certify, however, "rests in the sound discretion of the federal court." *Expressions Hair Design* v. *Schneiderman*, 581 U. S. \_\_\_, \_\_\_ (2017) (SOTOMAYOR, J., concurring in judgment) (slip op., at 8). We decline to exercise that discretion in this instance. Minnesota's request for certification comes very late in the day: This litigation had been ongoing in the federal courts for over seven years before the State made its certification request in its merits brief before this Court. See *Stenberg* v. *Carhart*, 530 U. S. 914, 945 (2000) (noting, in denying certification, that the State had never asked the lower federal courts to certify). And the State has not offered sufficient reason to believe that certification would obviate the need to address the constitutional question. Our analysis today reflects the State's proffered interpretation; nothing in that analysis would change if the State's interpretation were also adopted by the Minnesota Supreme Court. Nor has the State (or the dissent) suggested a viable alternative construction that the Minnesota Supreme Court might adopt instead. See Brief for Respondents 56–58; *post,* at 5–8.

APPENDIX

State Laws Prohibiting Accessories or Apparel in the Polling Place*

| Alaska | Alaska Stat. §§15.15.170, 15.56.016(a)(2) (2016) |
|---|---|
| Arkansas | Ark. Code Ann. §7–1–103(a)(9) (Supp. 2017) |
| California | Cal. Elec. Code Ann. §§319.5, 18370 (West Cum. Supp. 2018) |
| Colorado | Colo. Rev. Stat. §1–13–714(1) (2017) |
| Connecticut | Conn. Gen. Stat. §9–236 (2017) |
| Delaware | Del. Code Ann., Tit. 15, §4942 (2015) |
| District of Columbia | D. C. Code §1–1001.10(b)(2) (2016); D. C. Munic. Regs., tit. 3, §707, 65 D. C. Reg. 4504 (2018) |
| Georgia | Ga. Code Ann. §21–2–414(a) (Supp. 2017) |
| Hawaii | Haw. Rev. Stat. §11–132(d) (2009); Haw. Admin. Rule §3–172–63(a) (2017) |
| Illinois | Ill. Comp. Stat., ch. 10, §5/7–41(c) (West 2016) |
| Indiana | Ind. Stat. Ann. §3–14–3–16 (Lexis 2011) |
| Kansas | Kan. Stat. Ann. §25–2430(a) (2006) |
| Louisiana | La. Rev. Stat. Ann. §18:1462 (West Cum. Supp. 2018) |

---

  *Based on statutory or regulatory language and official resources, where available.

Appendix to opinion of the Court

| Massachusetts | Mass. Gen. Laws Ann. ch. 54, §65 (West 2007) |
|---|---|
| Michigan | Mich. Comp. Laws Ann. §168.744 (West Cum. Supp. 2018) |
| Minnesota | Minn. Stat. §211B.11(1) (Supp. 2017) |
| Mississippi | Miss. Code Ann. §23–15–895 (Cum. Supp. 2017) |
| Missouri | Mo. Rev. Stat. §115.637(18) (2006) |
| Montana | Mont. Code Ann. §13–35–211 (2017) |
| Nebraska | Neb. Rev. Stat. §32–1524(2) (2016) |
| Nevada | Nev. Rev. Stat. §293.740 (2015) |
| New Hampshire | N. H. Rev. Stat. Ann. §659:43(I) (Cum. Supp. 2017) |
| New Jersey | N. J. Stat. Ann. §19:34–19 (West 2014) |
| New Mexico | N. M. Stat. Ann. §1–20–16 (2011) |
| New York | N. Y. Elec. Law Ann. §8–104(1) (West 2018) |
| North Dakota | N. D. Cent. Code Ann. §16.1–10–03 (2015) |
| Ohio | Ohio Rev. Code Ann. §3501.35(A) (Lexis Supp. 2018) |
| South Carolina | S. C. Code Ann. §7–25–180 (2017 Cum. Supp.) |
| South Dakota | S. D. Codified Laws §12–18–3 (Cum. Supp. 2017) |
| Tennessee | Tenn. Code Ann. §2–7–111(b) (2014) |
| Texas | Tex. Elec. Code Ann. §61.010(a) (West 2010) |
| Utah | Utah Code §20A–3–501 (2017) |

Appendix to opinion of the Court

| Vermont | Vt. Stat. Ann., Tit. 17, §2508(a)(1) (Cum. Supp. 2017) |
| --- | --- |
| Wisconsin | Wis. Stat. §12.03 (2011–2012) |

# SUPREME COURT OF THE UNITED STATES

No. 16–1435

### MINNESOTA VOTERS ALLIANCE, ET AL., PETITIONERS *v.* JOE MANSKY, ET AL.

ON WRIT OF CERTIORARI TO THE UNITED STATES COURT OF APPEALS FOR THE EIGHTH CIRCUIT

[June 14, 2018]

JUSTICE SOTOMAYOR, with whom JUSTICE BREYER joins, dissenting.

I agree with the Court that "[c]asting a vote is a weighty civic act" and that "State[s] may reasonably take steps to ensure that partisan discord not follow the voter up to the voting booth," including by "prohibit[ing] certain apparel [in polling places] because of the message it conveys." *Ante,* at 11–12. I disagree, however, with the Court's decision to declare Minnesota's political apparel ban unconstitutional on its face because, in its view, the ban is not "capable of reasoned application," *ante,* at 19, when the Court has not first afforded the Minnesota state courts "'a reasonable opportunity to pass upon'" and construe the statute, *Babbitt* v. *Farm Workers*, 442 U. S. 289, 308 (1979). I would certify this case to the Minnesota Supreme Court for a definitive interpretation of the political apparel ban under Minn. Stat. §211B.11(1) (Supp. 2017), which likely would obviate the hypothetical line-drawing problems that form the basis of the Court's decision today.

I

As the Court acknowledges, Minnesota adopted its political apparel ban late in the 19th century against the backdrop of often "'chaotic'" voting conditions where "[c]rowds would gather to heckle and harass voters who

appeared to be supporting the other side." *Ante,* at 2. Polling places became "highly charged ethnic, religious, and ideological battleground[s] in which individuals were stereotyped as friend or foe," even "on the basis of clothing." R. Bensel, The American Ballot Box in the Mid-Nineteenth Century 21 (2004). As a result, States began adopting reforms "to address these vulnerabilities and improve the reliability of elections." *Ante,* at 3.

Minnesota thus enacted the political apparel ban at issue in this case, which prohibits an individual from wearing "[a] political badge, political button, or other political insignia . . . at or about the polling place." §211B.11(1). Respondents maintain that this prohibition, together with other election-day regulations, furthers Minnesota's compelling interests in (1) "maintaining peace, order and decorum in the polling place," (2) "protecting voters from confusion and undue influence such as intimidation," and (3) "preserving the integrity of its election process." Brief for Respondents 41 (internal quotation marks and alterations omitted); see *Burson* v. *Freeman*, 504 U. S. 191, 193, 199 (1992) (plurality opinion) (recognizing such interests as compelling).

The majority accords due respect to the weight of these state interests in concluding that there is "no basis for rejecting Minnesota's determination that some forms of advocacy should be excluded from the polling place, to set it aside as 'an island of calm in which voters can peacefully contemplate their choices.'" *Ante,* at 11. Polling places today may not much resemble the chaotic scenes of the turn of the 20th century, but they remain vulnerable to interpersonal conflicts and partisan efforts to influence voters.* Even acts of interference that are "undetected or

———————

*See, *e.g.,* J. Johnson, Fight Breaks Out at Polling Place (Nov. 8, 2016) (describing a fight in which a voter sprayed pepper spray at a campaign volunteer who allegedly had been handing out campaign

less than blatant . . . may nonetheless drive the voter away before remedial action can be taken." *Burson*, 504 U. S., at 207; see also Brief for Campaign Legal Center as *Amicus Curiae* 9 (noting that, "[a]bsent a ban on political paraphernalia, [poll] workers might unintentionally exhibit unconscious bias against voters who wear the 'wrong' paraphernalia").

In holding that a polling place constitutes a nonpublic forum and that a State must establish only that its limitations on speech inside the polling place are reasonable, see *ante,* at 8–9, the Court goes a long way in preserving States' discretion to determine what measures are appropriate to further important interests in maintaining order and decorum, preventing confusion and intimidation, and protecting the integrity of the voting process. The Court errs, however, in declaring Minnesota's political apparel ban unconstitutional under that standard, without any guidance from the State's highest court on the proper interpretation of that state law. *Ante,* at 13, 19, n. 7.

## II

The Court invalidates Minnesota's political apparel ban

---

materials), http://www.wpbf.com/article/fight-breaks-out-at-polling-place/ 8258506 (all Internet materials as last visited June 8, 2018); R. Reilly, A Guy in a Trump Shirt Carried a Gun Outside of a Virginia Polling Place. Authorities Say That's Fine (Nov. 4, 2016) (describing a man wearing a shirt bearing the name of a candidate and carrying a weapon outside of a polling place), https://www.huffingtonpost.com/entry/trump-supporter-gun-voter-intimidation-virginia_us_581cf16ee4b0aac624846eb5; Houston Chronicle, Nov. 5, 2012, p. 2 (reporting that individuals wearing shirts bearing the name of a racial equality organization allegedly were "disruptive," "took over" a polling place, and were "electioneering and voicing support" for a particular candidate); Orlando Sentinel, Nov. 8, 2006, p. A5 (reporting arrest of a poll worker who was "charged with assault and interfering with an election after allegedly choking a voter and pushing him out the door"); Orlando Sentinel, Mar. 2, 2005, p. B1 (reporting "[s]houting matches and rowdy behavior" and "harass[ment] and intimidat[ion] at the polls").

based on its inability to define the term "political" in §211B.11(1), so as to discern "some sensible basis for distinguishing what may come in from what must stay out" of a polling place. *Ante,* at 12–13. The majority believes that the law is not "capable of reasoned application," *ante,* at 19, but it reaches that conclusion without taking the preferential step of first asking the state courts to provide "an accurate picture of how, exactly, the statute works," *Expressions Hair Design* v. *Schneiderman*, 581 U. S. ___, ___ (2017) (SOTOMAYOR, J., concurring in judgment) (slip op., at 5). It is a "cardinal principle" that, "when confronting a challenge to the constitutionality of a . . . statute," courts "will first ascertain whether a construction . . . is fairly possible that will contain the statute within constitutional bounds," and in the context of a challenge to a state statute, federal courts should be particularly hesitant to speculate as to possible constructions of the state law when "the state courts stand willing to address questions of state law on certification." *Arizonans for Official English* v. *Arizona,* 520 U. S. 43, 78–79 (1997) (internal quotation marks omitted); see Minn. Stat. §480.065(3) (2016) (authorizing the Minnesota Supreme Court to answer certified questions). Certification "save[s] time, energy, and resources and helps build a cooperative judicial federalism." *Lehman Brothers* v. *Schein*, 416 U. S. 386, 391 (1974). Neither of the majority's proffered reasons for declining to certify this case justifies its holding.

First, the Court notes that respondents' "request for certification comes very late in the day," as the litigation already had been ongoing for more than seven years before the request. *Ante,* at 19, n. 7. But certification is not an argument subject to forfeiture by the parties. It is a tool of the federal courts that serves to avoid "friction-generating error" where a federal court attempts to construe a statute "not yet reviewed by the State's highest court." *Arizonans for Official English*, 520 U. S., at 79. This Court has

certified questions to a state court "sua sponte, even though the parties had not sought such relief and even though the district court and the court of appeals previously had resolved the disputed point of state law." S. Shapiro, K. Geller, T. Bishop, E. Hartnett, & D. Himmelfarb, Supreme Court Practice §9.4, p. 611 (10th ed. 2013) (citing *Elkins* v. *Moreno*, 435 U. S. 647, 660–663, 668–669 (1978)); see also *Massachusetts* v. *Feeney*, 429 U. S. 66 (1976) (*per curiam*) (certifying a question to the Supreme Judicial Court of the Commonwealth of Massachusetts "on [the Court's] own motion"). Respondents' delay in asking for certification does nothing to alter this Court's responsibility as a matter of state-federal comity to give due deference to the state courts in interpreting their own laws.

Second, the majority maintains that respondents have "not offered sufficient reason to believe that certification would obviate the need to address the constitutional question," as "nothing in [its] analysis would change if [respondents'] interpretation were also adopted by the Minnesota Supreme Court." *Ante,* at 19, n. 7. The majority also relies on its view that respondents have not "suggested a viable alternative construction that the Minnesota Supreme Court might adopt instead." *Ibid.* To presume that the Minnesota Supreme Court would adopt respondents' interpretation wholesale or that it could not provide a construction of its own that is "capable of reasoned application," *ante,* at 19, however, reflects precisely the "gratuitous" "'[s]peculation . . . about the meaning of a state statute'" that this Court has discouraged, *Arizonans for Official English*, 520 U. S., at 79.

It is at least "fairly possible" that the state court could "ascertain . . . a construction . . . that will contain the statute within constitutional bounds." *Id.,* at 78 (internal quotation marks omitted). Ultimately, the issue comes down to the meaning of the adjective "political," as used to

describe what constitutes a "political badge, political button, or other political insignia." §211B.11(1). The word "political" is, of course, not inherently incapable of definition. This Court elsewhere has encountered little difficulty discerning its meaning in the context of statutes subject to First Amendment challenges. See, *e.g., Civil Service Comm'n* v. *Letter Carriers*, 413 U. S. 548, 550–551 (1973) (rejecting First Amendment overbreadth and vagueness challenge to §9(a) of the Hatch Act, then codified at 5 U. S. C. §7324(a)(2), which prohibited federal employees from taking "'an active part in political management or in political campaigns'"); *Broadrick* v. *Oklahoma*, 413 U. S. 601, 602 (1973) (rejecting First Amendment overbreadth and vagueness challenge to a similar Oklahoma law that "restricts the political activities of the State's classified civil servants").

Even here, the majority recognizes a substantial amount of speech that "clear[ly]" qualifies as "political," such as "items displaying the name of a political party, items displaying the name of a candidate, and items demonstrating support of or opposition to a ballot question." *Ante,* at 14 (internal quotation marks omitted). The fact that the majority has some difficulty deciphering guidance to §211B.11(1) that also proscribes "[i]ssue oriented material designed to influence or impact voting" and "[m]aterial promoting a group with recognizable political views," App. to Pet. for Cert. I–2; see *ante,* at 14–17, does not mean that the statute as a whole is not subject to a construction that falls within constitutional bounds. As this Court has made clear in the context of the First Amendment overbreadth doctrine, the "mere fact" that petitioners "can conceive of some impermissible applications of [the] statute is not sufficient to render it" unconstitutional. *United States* v. *Williams*, 553 U. S. 285, 303 (2008) (internal quotation marks omitted). That is especially so where the state court is capable of clarifying the boundaries of state

law in a manner that would permit the Court to engage in a comprehensive constitutional analysis. See, *e.g., Virginia* v. *American Booksellers Assn., Inc.*, 484 U. S. 383 (1988) (certifying questions to the Virginia Supreme Court for clarification as to whether a state statute was readily susceptible to a narrowing construction that would not violate the First Amendment); *Commonwealth* v. *American Booksellers Assn., Inc.*, 236 Va. 168, 372 S. E. 2d 618 (1988) (responding to certification with such a narrowing construction).

Furthermore, the Court also should consider the history of Minnesota's "implementation" of the statute in evaluating the facial challenge here. *Forsyth County* v. *Nationalist Movement*, 505 U. S. 123, 131 (1992). That history offers some assurance that the statute has not been interpreted or applied in an unreasonable manner. There is no evidence that any individual who refused to remove a political item has been prohibited from voting, and respondents maintain that no one has been referred for prosecution for violating the provision. See Brief for Respondents 4, n. 2. Since the political apparel ban was enacted in the late 19th century, this is the first time the statute has been challenged on the basis that certain speech is not "political." Tr. of Oral Arg. 44. Even then, petitioners' as-applied challenge was rejected by the District Court and the Court of Appeals for the Eighth Circuit. See *Minnesota Majority* v. *Mansky*, 62 F. Supp. 3d 870, 878 (Minn. 2014); *Minnesota Majority* v. *Mansky*, 2015 WL 13636675, *12 (D Minn., Mar. 23, 2015); *Minnesota Majority* v. *Mansky*, 849 F. 3d 749, 752–753 (CA8 2017). Petitioners did not seek review of those claims in this Court. See Pet. for Cert. i. On the whole, the historical application of the law helps illustrate that the statute is not so "indeterminate" so as to "carr[y] with it '[t]he opportunity for abuse.'" *Ante,* at 17.

## III

Especially where there are undisputedly many constitu-tional applications of a state law that further weighty state interests, the Court should be wary of invalidating a law without giving the State's highest court an opportunity to pass upon it.  See *Babbitt*, 442 U. S., at 309; *Arizonans for Official English*, 520 U. S., at 79.  Because the Court declines to take the obvious step of certification in this case, I respectfully dissent.