**PRECEDENTIAL**

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT
_____

No. 18-3105
_____

JAMES PORTER; MARILYNN SANKOWSKI

v.

CITY OF PHILADELPHIA; BARBARA DEELEY,
INDIVIDUALLY AND IN HER OFFICIAL CAPACITY AS
THE SHERIFF OF THE CITY AND COUNTY OF
PHILADELPHIA; DARYLL STEWART, INDIVIDUALLY
AND IN HIS OFFICIAL CAPACITY IN THE CITY AND
COUNTY OF PHILADELPHIA; ED CHEW,
INDIVIDUALLY AND IN HIS OFFICIAL CAPACITY AS
COUNSEL IN THE CITY AND COUNTY OF
PHILADELPHIA; WILLIAM BENGOCHEA,
INDIVIDUALLY AND IN HIS OFFICIAL CAPACITY AS
A SHERIFF IN THE CITY AND COUNTY OF
PHILADELPHIA; GUERINO BUSILLO, INDIVIDUALLY
AND IN HIS OFFICIAL CAPACITY AS A SHERIFF IN
THE CITY AND COUNTY OF PHILADELPHIA; JAMES
MCCARRIE, INDIVIDUALLY AND IN HIS OFFICIAL
CAPACITY AS A SHERIFF IN THE CITY AND COUNTY
OF PHILADELPHIA; ANGELINEL BROWN,
INDIVIDUALLY AND IN HER OFFICIAL CAPACITY AS
A SHERIFF IN THE CITY AND COUNTY OF
PHILADELPHIA; PARIS WASHINGTON,
INDIVIDUALLY AND IN HER OFFICIAL CAPACITY AS
A SHERIFF IN THE CITY AND COUNTY OF
PHILADELPHIA,

CITY OF PHILADELPHIA,
                                        Appellant
_____

On Appeal from the United States District Court

for the Eastern District of Pennsylvania
(District Court Civil No. 2-13-cv-02008)
District Judge: Honorable Michael M. Baylson
_____

Argued July 1, 2019

Before: McKEE, PORTER, and RENDELL *Circuit Judges*

(Opinion filed: September 18, 2020)

Kimberly Y. Smith Rivera  **[Argued]**
David C. Gibbs III
Gibbs Law Firm
2648 FM 407, Suite 240
Bartonville, TX 76226
            *Counsel for Appellee*


Craig R. Gottlieb     **[Argued]**
City of Philadelphia Law Department
1515 Arch Street, 17th Floor
Philadelphia, PA 19102
            *Counsel for Appellant*

_____

OPINION OF THE COURT
_____

McKEE, *Circuit Judge*

We are asked to decide if the City of Philadelphia's unwritten policy of preventing announcements at mortgage foreclosure sheriff's sales is unconstitutional. Pursuant to that policy, City employees forcibly prevented James Porter from publicly announcing to bidders at such a sale that he and his wife, Debra Porter, had an unrecorded interest in a property being auctioned. Porter sued, arguing that the City's policy violated his First Amendment right to free speech. A jury agreed and awarded him $750,000 in damages and the District Court thereafter upheld that award. For the reasons that follow, we will reverse and remand with instructions to vacate the judgment and enter judgment in favor of the City.

## I. FACTUAL BACKGROUND[1]

This dispute arises from James Porter's interest in a property located at 1039-55 Frankford Avenue in Philadelphia.[2] Porter co-owned that property with a partner, and his wife held an unrecorded mortgage on the property to secure a $2.8 million promissory note.[3] Shortly after Porter's wife obtained her mortgage, and unbeknownst to Porter, his partner obtained a second mortgage on the property from Commerce Bank.[4] That mortgage eventually went into default and the property was thereafter listed for sale at a regularly scheduled mortgage foreclosure sheriff's sale conducted by the City of Philadelphia.[5]

The Porters filed several actions regarding the Frankford Avenue property prior to the sheriff's sale. A Pennsylvania state court awarded Debra damages for the title company's failure to record her mortgage but declined to have it retroactively recorded.[6] That ruling was not appealed and became final.[7] After Commerce Bank successfully foreclosed on the property, the state court denied the Porters' motion to postpone the sale based on Debra's alleged interest in the

---

[1] We present the facts in the light most favorable to Porter despite the conflicting versions of events. *See Mancini v. Northampton Cty.*, 836 F.3d 308, 314 (3d Cir. 2016) (quoting *In re Lemington Home for the Aged*, 777 F.3d 620, 626 (3d Cir. 2015)).

[2] *Porter v. City of Phila.*, 337 F. Supp. 3d 530, 536 (E.D. Pa. 2018).

[3] *Id.*

[4] Porter Br. at 5.

[5] *Porter*, 337 F. Supp. 3d at 536.

[6] *Porter v. TD Bank, N.A.*, No. CIV.A. 10-7243, 2012 WL 3704817, at *2 (E.D. Pa. Aug. 27, 2012), *aff'd on other grounds*, 519 F. App'x 109 (3d Cir. 2013) (per curiam).

[7] While the Porters appealed other aspects of this decision, they declined to appeal the decision regarding recordation. *Id.*; *see also* City Br. at 9-10. Therefore, Commerce Bank's previously recorded mortgage had first priority as to any buyer who purchased the property without notice of the prior lien.

property.[8] The Porters also filed a declaratory judgment action in the Eastern District of Pennsylvania claiming that Debra's unrecorded mortgage on the property had priority over Commerce Bank's subsequently recorded mortgage.[9] The federal declaratory judgment action was pending at the time of the sheriff's sale.[10]

Porter also contacted the Sheriff's Office directly several times before the sheriff's sale in an effort to inform that office about his wife's alleged interest in the property and the outstanding federal lawsuit.[11] Porter planned to yet again assert his interest in the property at a hearing regarding the foreclosure in state court the day before the sheriff's sale, but the judge cancelled the hearing and allowed the sale to proceed.[12]

---

[8] *Id.* at *2-3.

[9] *Porter*, 337 F. Supp. 3d at 536; App. 636-37.

[10] App. 636-37. After the sheriff's sale, the District Court granted summary judgment to the defendant on preclusion grounds based on the Pennsylvania Superior Court's decision declining to retroactively record Debra's mortgage, and we affirmed in an unreported per curiam opinion. *See Porter v. TD Bank N.A.*, 519 F. App'x 109, 110 (3d Cir. 2013).

[11] *Porter*, 337 F. Supp. 3d at 536 ("Porter had gone to the Sheriff's office on several occasions, trying to prevent the sheriff's sale of the property proceeding, and alternatively attempting to ensure that whoever bought the property at the sheriff's sale was aware of the pending declaratory judgment action."); App. 639.

[12] App. 637; Porter Br. at 5. In his brief, Porter claims that the foreclosure court cancelled this hearing "in reliance on the bank's representation" that an announcement would be made at the sheriff's sale. Porter Br. at 16. However, Porter provides no support for his contention that the court relied on the bank's agreement to make an announcement when cancelling the hearing. In his trial testimony, Porter makes no mention of the reason for the *sua sponte* cancellation. App. 638; *see also* App. 373-74 (discussing the cancelled hearing, Porter's attorney makes no mention of the reason for the cancellation). Moreover, these assertions do not alter our analysis or conclusion. We mention them only to more fully explain the context in which the sheriff's sale took place.

4

Undeterred and determined to warn potential bidders about his wife's alleged interest in the property, Porter sought Commerce Bank's assurance that it would inform bidders at the sheriff's sale about the pending lawsuit regarding the property.[13] Accordingly, Porter's attorney e-mailed Commerce Bank's attorney to confirm that "the bank will make sure that the sheriff announces the existence of the federal court action at the sheriff's sale to potential bidders."[14] Porter's attorney also sent Porter an e-mail stating:

> Jim, I'm just confirming what I told you to do today if the bank does not announce [Debra's] lawsuit at the sale. You are to say that Deb has filed a federal lawsuit claiming she has an unrecorded mortgage which would survive the sheriff's sale.[15]

Porter—accompanied by his wife, brother, and mother—attended the sheriff's sale on January 4, 2011 to ensure potential bidders were warned about the potential lawsuit.[16] Commerce Bank's attorney never arrived at the sheriff's sale. Thus, when the property came up for sale, Porter stood up and began reading his attorney's email in an attempt to make the announcement himself.[17] Shortly after Porter began speaking, Edward Chew, an attorney for the Sheriff's Office, and Deputy Sheriff Daryll Stewart charged Porter and ordered him to stop speaking.[18] Chew grabbed Porter by the arm and signaled for the deputies to assist. They then "pulled Porter by the collar, put Porter in a chokehold, placed him in handcuffs, hit him with a stun gun, and eventually dragged him from the room."[19] Porter and at least one deputy required medical attention as a result of the scuffle.[20] Porter was arrested

---

[13] *Porter*, 337 F. Supp. 3d at 536; Porter Br. at 6.
[14] App. 362-63.
[15] *Porter*, 337 F. Supp. 3d at 536.
[16] Porter Br. at 6.
[17] *Porter*, 337 F. Supp. 3d at 536.
[18] *Id.*
[19] *Id.*
[20] *Id.*

and later convicted of misdemeanor resisting arrest, although he was acquitted of all other charges.[21]

## II.    PROCEDURAL HISTORY

Porter sued the City of Philadelphia and various individuals in their official capacities in state court alleging that their conduct during the sheriff's sale violated his First Amendment right to free speech. The defendants thereafter removed the suit to the United States District Court for the Eastern District of Pennsylvania.[22] There, Porter insisted on representing himself and proceeded *pro se*. The District Court closely supervised the case and conducted extensive pretrial proceedings to ensure Porter had a fair trial.[23] Porter's civil rights claims included a *Monell* claim against the City based upon its unwritten policy of not allowing any non-bidder to comment at sheriff's sales.[24]

At trial, the court instructed the jury that "Mr. Porter had a constitutionally-protected right to speak at the sheriff's sale in order to make the announcement that had been discussed with [his] attorney. In other words, no person employed by the

---

[21] *Id.*; *see also* Porter Br. at 9.

[22] *Porter*, 337 F. Supp. 3d at 537. Porter's mother, Marilyn Sankowski was a co-plaintiff and alleged that the Sheriff's Office attorney, Edward Chew, used excessive force against her by grabbing her during the exchange. *Id.* at 539. Sankowski succeeded at trial against Chew and did not appeal. *Id.* at 543.

[23] *Id.* at 537. Indeed, the District Court is to be commended for the manner in which it conducted the rather involved pretrial hearings as well as the trial itself.

[24] *Monell v. Dep't of Soc. Servs. of City of New York*, 436 U.S. 658 (1978). The District Court initially ruled that Porter had waived this claim and dismissed it. However, after the City's witnesses conceded that the City had an unwritten policy of not allowing comments at sheriff's sales, the court reinstated that claim over the City's objection and the claim was submitted to the jury. Inasmuch as we conclude that the City's policy did not violate Porter's First Amendment rights, we need not address the City's argument that the court erred in reinstating the *Monell* claim.

sheriff's office, whether a law enforcement officer or not, had any right to interfere with their making such an announcement," and that the sheriff's policy against announcements "as applied to the plaintiff[] at the hearing, was in violation of [his] constitutional right to freedom of speech and to petition."[25]

The jury returned a verdict for Porter on the *Monell* claim and awarded him $750,000 in damages.[26] The jury also awarded Porter $7,500 on his claim against Edward Chew for retaliating against Porter for the exercise of his First Amendment rights.[27] The District Court denied the City's motions for judgment as a matter of law, a new trial, or remittitur. The court found that the policy banning comments during the sheriff's sale was not a reasonable time, place, and manner restriction because Porter did not have ample alternatives to communicate his message, the ban was viewpoint discriminatory, and the policy was not narrowly tailored.[28] The court ruled that remittitur was not warranted because the $750,000 award was neither a violation of due process nor "so grossly excessive as to shock the judicial conscience."[29] This appeal followed.

## III. STANDARD OF REVIEW

We review the denial of judgment as a matter of law *de novo*.[30] To the extent that the District Court's denial is based on its application of the nonpublic public forum test to the facts of this case, we also review the decision *de novo*.[31] We review

___

[25] App. 972-73.

[26] *Porter*, 337 F. Supp. 3d at 543.

[27] *Id*. However, the court granted Chew's motion for judgment as a matter of law and Porter did not appeal that ruling. Thus, only the propriety of the verdict in favor of Porter on his *Monell* claim is before us.

[28] *Id.* at 552-53.

[29] *Id.* at 554 (quoting *Cortez v. Trans Union, LLC*, 617 F.3d 688, 718 (3d Cir. 2010)).

[30] *Acumed LLC v. Advanced Surgical Servs. Inc.*, 561 F.3d 199, 211 (3d. Cir. 2009).

[31] *See Starceski v. Westinghouse Elec. Corp.*, 54 F.3d 1089, 1095 (3d Cir. 1995) ("In reviewing a district court's denial of

the evidence in the light most favorable to the non-moving party and enter judgment as a matter of law if, upon review of the record, "there is insufficient evidence from which a jury reasonably could find liability."[32]

## IV.   DISCUSSION

"Nothing in the Constitution requires the Government freely to grant access to all who wish to exercise their right to free speech on every type of Government property without regard to the nature of the property or to the disruption that might be caused by the speaker's activities."[33] A city's liability for an alleged First Amendment violation must be based upon a policy or custom of the city rather than upon the act of an individual city employee.[34] Accordingly, when a First Amendment challenge is brought against a city, we must first determine what official city policy or custom is at issue for the purposes of § 1983, and then identify and apply the correct First Amendment principles to that policy based on the nature and use of the government owned or controlled forum where the speech occurred.

### A.   Characteristics of Philadelphia's Sheriff's Sales

A mortgage foreclosure sheriff's sale is a court-ordered public auction of foreclosed properties organized by the government.[35] A mortgage holder can initiate a foreclosure

---

a motion for a new trial[,] . . . if the court's denial of the motion is based on application of a legal precept, our review is plenary . . . .").

[32] *Mancini*, 836 F.3d at 314 (quoting *Lightning Lube, Inc. v. Witco Corp.*, 4 F.3d 1153, 1166 (3d Cir. 1993)).

[33] *Cornelius v. NAACP Legal Def. & Educ. Fund, Inc*., 473 U.S. 788, 799-800 (1985).

[34] *Monell*, 436 U.S. at 690.

[35] *Porter*, 337 F. Supp. 3d at 547 (describing the sheriff's sale as "a public auction of real property, carried out by a governmental entity, pursuant to a state statute providing for orderly and public opportunity to acquire properties that have been foreclosed upon for failure to pay outstanding mortgages."); Philadelphia Sheriff's Dep't, *Everything You Need to Know About Sheriff Sales*,

8

action against a property owner who has defaulted on a mortgage and obtain a judgment in foreclosure.[36] The mortgage holder can then obtain and file a writ of execution directing the sheriff to sell the property at a public auction.[37] It is the sheriff's duty to conduct sheriff's sales and set policies and procedures for these auctions.[38] In Philadelphia, sheriff's sales take place once a month in a room about four times the size of a typical courtroom.[39] Maintaining an orderly environment is necessary to efficiently sell hundreds of properties and avoid chaos.[40] Because hundreds of foreclosed properties are sold at each auction, the auction is conducted with the decorum of a courtroom.[41] In an effort to maintain such an environment, the sheriff has adopted an unwritten policy barring comments or announcements from non-

---

https://www.officeofphiladelphiasheriff.com/en/real-estate/how-sheriffs-sales-work (last visited Sept. 3, 2020).

[36] App. 965-66.

[37] *Id.* at 966-67; *see also* App. 504 (explaining that the Sheriff's Office is "acting [as] the court's arm selling . . . property" at a sheriff's sale).

[38] *See, e.g.*, App. 966; City Br. at 8-9; App. 384 (describing the duty of the sheriff to "[m]ake sure the sheriff's sale[s] run accordingly."); *see also* Pa. R.C.P. 3129.1, 3129.2, 3129,3, and 3135 (describing the procedures of and the sheriff's duties regarding sheriff's sales); 68 Pa. Stat. and Cons. Stat. Ann. § 2310 (West) (providing for a commission to be paid to the sheriff for the service of conducting mortgage foreclosures sales); 42 Pa. Stat. Ann. § 21104(b)-(c) (same); 43 Pennsylvania Law Encyclopedia, *Sheriffs and Constables* § 89 (2019) ("It is the duty of a sheriff to make a sale of a judgment debtor's property in accordance with the court's writ.").

[39] City Br. at 8.

[40] App. 504; City Br. at 8.

[41] App. 390-91; 504.

9

bidding[42] members of the public during the sale.[43] A property owner, or his or her attorney, may present a court order or bankruptcy petition to stop or postpone the sale when a property comes up for auction, but all other comments are prohibited.[44]

## B.   *Monell* **Claims under § 1983**

Pursuant to the Supreme Court's holding in *Monell*, a city is only liable under § 1983 for constitutional violations that are caused by its official policies and customs.[45]   "[A] municipality cannot be held liable *solely* because it employs a

---

[42] To the extent that a bid and directly related speech (*i.e.* offering a price) can be construed as a public announcement, naturally this is allowed. That is how we understand the City's references in its brief, *see* City Br. at 8, 19, 24, to the policy prohibiting "non-bidders" from speaking. *See also* City Br. at 19 ("[I]t is inherently reasonable to preclude all non-bid comments during an auction . . ."). Nowhere does the City argue, nor do we imply, that the ban on public announcements allows bidders to make public announcements unrelated to bids.

[43] The District Court concluded that "the uncontroverted evidence [is] clear that the Sheriff's Office had a policy of forbidding announcements at sales." *Porter*, 337 F. Supp. 3d at 548. This is consistent with the testimony of several witnesses from both Porter and the City, including Sheriff Barbara Deeley. *Id.* at 547 ("The defendant Sheriff at trial admitted . . . the existence of a policy forbidding announcements at Sheriff's sales."); *see also id.* at 539-40; App. 390; App. 504-05.

[44] City Br. at 8-9.

[45] *Monell*, 436 U.S. at 690 ("Local governing bodies . . . can be sued directly under § 1983 for monetary, declaratory, or injunctive relief where . . . the action that is alleged to be unconstitutional implements or executes a policy statement, ordinance, regulation, or decision officially adopted and promulgated by that body's officers."); *see also Baloga v. Pittston Area Sch. Dist.*, 927 F.3d 742, 761 (3d Cir. 2019) (explaining that a municipality is only liable for a policy or custom promulgated by an actor with final decision-making authority).

tortfeasor . . . in other words, a municipality cannot be held liable under § 1983 on a *respondeat superior* theory."[46] A policy need not be passed by a legislative body, or even be in writing, to constitute an official policy for the purposes of § 1983. A pertinent decision by an official with decision-making authority on the subject constitutes official policy.[47] Therefore, we must first determine whether the conduct that gave rise to Porter's First Amendment claim was pursuant to an official policy or custom. If it was, that conduct could support Porter's *Monell* claim. In contrast, if the conduct was simply that of an individual employee who was not acting pursuant to a policy or custom, that conduct cannot give rise to municipal liability under *Monell*.

As the District Court explained, there is uncontroverted evidence from multiple witnesses, including Sheriff Deeley, that the City had an unwritten policy prohibiting comments during sheriff's sales.[48] Sheriff Deeley testified that she had a duty to "[m]ake sure the sheriff's sale[s] run accordingly"[49] and the District Court instructed the jury that "[o]ne of the duties of the Sheriff is to conduct sheriff's sales."[50] Likewise, the District Court instructed the jury that "[t]he policy or custom at issue here, as testified by representatives of the sheriff's office, is not to allow announcements or statements at a sheriff's sale,"[51] and furthermore that there was not "any dispute" that "[t]he Sheriff's Office had the policy not to allow

---

[46] *Monell*, 436 U.S. at 691.

[47] *Pembaur v. City of Cincinnati*, 475 U.S. 469, 483-84 (1986) ("Municipal liability under § 1983 attaches where . . . a deliberate choice to follow a course of action is made from among various alternatives by the official or officials responsible for establishing final policy with respect to the subject matter in question.").

[48] *Porter*, 337 F. Supp. 3d at 548.

[49] App. 384.

[50] App. 966; *see also* Pa. R.C.P. 3145 (describing the sheriff's legal duties regarding sheriff's sales); App. 504 (explaining that the Sheriff's Office is "acting [as] the court's arm selling . . . property" at a sheriff's sale).

[51] App. 980.

announcements at sheriff's sales.[52] We therefore conclude that the City's policy of precluding public announcements at sheriff's sales was an official policy of the City for purposes of § 1983 liability under *Monell*.

Given Porter's allegation that policy was subjectively and inconsistently enforced, it may have been preferable to submit the existence, nature, and reasonableness of the policy to the jury.[53] Nevertheless, the District Court removed any possibility that the jury would consider this issue when it instructed the jury that the sheriff's office had a policy against announcements that was unconstitutional as applied to the plaintiffs.[54] The jury was therefore not called upon to determine the contours of the City's policy or its reasonableness. We review the District Court's conclusion regarding the existence and nature of the policy *de novo*. We credit its ruling that the policy prohibiting public comments existed, but we disagree with the analysis the followed from that finding.

The District Court held that the City's policy violated Porter's First Amendment right to free speech. In doing so, it

---

[52] App. 1013 ("You heard testimony about the policy. I don't think there's any dispute about it. The Sheriff's Office had the policy not to allow announcements at sheriff's sales.").

[53] *See* App. 6-9 (Verdict Sheet).

[54] *See* App. 972-73 ("You have heard testimony that the sheriff's office had a policy against announcements. I instruct you that this policy, as applied to the plaintiffs at the hearing, was in violation of their constitutional right to freedom of speech and to petition. Plaintiff's [sic] attempt to speak was in furtherance of their constitutional right to speak and to petition."); *see also* App. 981 ("I instruct you that the Sheriff's policy was violative of the First Amendment if you find it was relied on by Defendants Chew and Stewart or the employees of the sheriff's office to cause Porter to be interrupted and seized as he was speaking."); App. 1013 ("The Sheriff's Office had the policy not to allow announcements at sheriff's sales . . . if you find that that policy was applied as to Mr. Porter, that was a violation of his constitutional rights—the policy was, for which the city is liable.").

relied upon Chew's testimony that he did not allow announcements that could depreciate the value of an auctioned property in concluding that the policy discriminated based on viewpoint.[55] The District Court also concluded that a "plausible nexus or affirmative link" between the City's policy prohibiting announcements during the sheriff's sale and Chew's "brutal implementation [of the policy] through physical force" is sufficient to hold the City liable under *Monell*.[56] Similarly, Porter acknowledges that "the evidence established that the City had a policy of not allowing announcements at sheriff's sales," but maintains that Chew "inconsistently enforced it based on what the speaker wanted to say."[57]

However, Porter has not shown that Chew was a policymaker.[58] To the extent the District Court suggests that the City is liable for Chew's individual decision-making, we cannot agree. His unendorsed actions, without more, did not become municipal policy or give rise to municipal liability under *Monell*. There is no evidence to suggest that municipal decision-makers were aware of Chew's inconsistent implementation of the no-comment policy or that Chew had previously used force to enforce it with the tacit approval of policymakers.[59] To the contrary, trial testimony indicates that the Sheriff's Office's policy was to ask people who tried to make announcements to sit down and, if they did not comply,

---

[55] *Porter*, 337 F. Supp. 3d at 552-53.

[56] *Porter*, 337 F. Supp. 3d at 553.

[57] Porter Br. at 11.

[58] *Kelly v. Borough of Carlisle*, 622 F.3d 248, 264-65 (3d Cir. 2010) (rejecting a § 1983 plaintiff's *Monell* claim where plaintiff "presented no evidence that [the chief of police] was a final policymaker for the Borough" whose actions or decisions subjected the City to liability).

[59] *See City of St. Louis v. Praprotnik*, 485 U.S. 112, 130 (1988) ("[T]he mere failure to investigate the basis of a subordinate's discretionary decisions does not amount to a delegation of policymaking authority, especially where . . . the wrongfulness of the subordinate's decision arises from a retaliatory motive or other unstated rationale.").

to escort them out of the hall.[60] Furthermore, one Sheriff's Office clerk testified that the violent response was something he "[had] never [seen] . . . before" at a sheriff's sale and agreed that it was "out of character of the normal conduct of business."[61] While the District Court found that the deputies approached Porter "at the request of Chew"[62] and that "Chew apparently asked for such a response,"[63] the fact that Chew apparently had the authority to direct the deputies to stop Porter from speaking does not make his decision to do so City policy. "The fact that a particular official . . . has discretion in the exercise of particular functions does not, without more, give rise to municipal liability based on an exercise of that discretion." [64] Rather, "[t]he official must also be responsible for establishing final government policy respecting such activity before the municipality can be held liable."[65] Thus, we cannot conclude that Chew's unofficial determination of how and when the policy was to be enforced, in contravention of the City's clear and nondiscriminatory policy prohibiting all comments, gives rise to liability under *Monell*.

---

[60] App. 336 (testifying about his experience witnessing over 600 sheriff's sales, Sheriff's Office clerk Richard Tyer explained that people who attempt to make announcements are "told to sit down," and "if they don't comply, then they'll be escorted out."); *see also* App. 466 (Sheriff's Office clerk Michael Riverso testifying that individuals making announcements are told to sit down); App. 552-53 (Witness Daryll Stewart explaining that procedure when someone stands up to make an announcement is to "ask them to step to the side" and then deal with the person's issue individually).

[61] App. 468.

[62] *Porter*, 337 F. Supp. 3d at 552.

[63] *Id.* at 553.

[64] *Pembaur*, 475 U.S. at 481-83 (internal citation omitted).

[65] *Id.*; *see also Praprotnik*, 485 U.S. at 129 (finding that even decisions by supervisory employees that are not reviewed by any higher official are not necessarily official city policy for purposes of § 1983 if the employee does not have policymaking authority); *Kelly*, 622 F.3d at 265 (holding that a city is not liable for a police officer's decision to arrest the plaintiff in a § 1983 suit because the decision was not reviewed and ratified by a municipal policymaker).

## C.    First Amendment Forum Analysis

Having identified the City's policy for the purposes of § 1983 liability, we next must determine the First Amendment principles applicable to speech at a mortgage foreclosure sheriff's sale. Because Porter's speech is not obscene, geared towards the incitement of violence, or libelous, it is undeniably protected by the First Amendment.[66] Accordingly, we can proceed directly to a discussion of the forum to determine the extent to which the City could limit Porter's right to free speech during a sheriff's sale. When it comes to First Amendment free speech challenges, "not every public property is the same, and different types of property will require different treatment."[67] There are three types of protected forums for speech occurring on government owned or controlled property.[68] The type of forum in which the relevant speech takes place "determines the contours of the First Amendment rights that a court recognizes when reviewing the challenged governmental action."[69]

Traditional public forums are places that the government has historically held out for speech and assembly, such as public streets and parks.[70] Traditional public forums are entitled to the greatest protection of speech. Accordingly, any content-based restrictions will receive strict scrutiny.[71]

---

[66] *See Eichenlaub v. Twp. of Indiana*, 385 F.3d 274, 282-83 (3d Cir. 2004) ("[E]xcept for certain narrow categories deemed unworthy of full First Amendment protection—such as obscenity, 'fighting words' and libel—all speech is protected by the First Amendment.").

[67] *NAACP v. City of Phila.*, 834 F.3d 435, 441 (3d Cir. 2016) (explaining that "the Supreme Court has grouped public properties along a spectrum" where First Amendment protections are determined based on the nature and use of the public property).

[68] *Id.*

[69] *Galena v. Leone*, 638 F.3d 186, 197 (3d Cir. 2011); *see also See United States v. Marcavage*, 609 F.3d 264, 274 (3d Cir. 2010) ("The degree of First Amendment protection a speaker enjoys depends on the type of forum in which his expressive activity occurred.").

[70] *NAACP*, 834 F.3d at 441.

[71] *Id.*

15

While the government may impose reasonable time, place, and manner restrictions on speech, viewpoint-based restrictions are prohibited.[72] Designated public forums are properties that have "not traditionally been regarded as a public forum [but are] intentionally opened up for that purpose."[73] When the government opens a forum for speech-related activity, the same standards apply as in a traditional public forum.[74] Finally, a nonpublic forum (or limited public forum) is a public property that has "not, as a matter of tradition or designation, been used for purposes of assembly and communication."[75]

---

[72] *Minn. Voters Alliance v. Mansky*, 138 S. Ct. 1876, 1885 (2018).

[73] *Id.* (quoting *Pleasant Grove City, Utah v. Summum*, 555 U.S. 460, 469 (2009)).

[74] *Id.*

[75] *Id.* The "nonpublic forum" has also sometimes been referred to as the "limited public forum," creating confusion about whether there is a difference between these two classifications. As we explained in *NAACP*, the Supreme Court recently has used the terms "limited public forum" and "nonpublic forum" interchangeably, suggesting that, if there is a distinction, these two categories are afforded the same treatment. *Id.* at 441 n.2; *see also Galena*, 638 F.3d at 197 n.8 (acknowledging the inconsistency among federal court and Supreme Court opinions on whether "limited public forum" and "nonpublic forum" are separate and distinct categories, but suggesting the Supreme Court has recently used the terms interchangeably). We will follow the Supreme Court's most recent application of the forum analysis in *Mansky*, 138 S. Ct. at 1885. There, the Supreme Court identified the three forums as traditional public forum, designated public forum, and nonpublic forum and applied the definition and legal test to the "nonpublic forum" that this Court has applied to the "limited public forum." *Id.* We need not resolve today the lingering doubt about the distinction between a "nonpublic" and "limited public" forum. The parties here agree that the sheriff's sale is a "limited public forum," which, for our purposes, we find synonymous with the nonpublic forum. We will therefore apply the principles of the nonpublic forum, as discussed in *Mansky*, to the sheriff's sale.

Rather, it is "a forum that is limited to use by certain groups or dedicated solely to the discussion of certain subjects."[76]

A nonpublic forum is entitled to lesser First Amendment protection than the other two forums. Accordingly, the government is allowed "much more flexibility to craft rules limiting speech."[77] "The government may reserve such a forum 'for its intended purposes, communicative or otherwise, as long as the regulation on speech is reasonable and not an effort to suppress expression merely because public officials oppose the speaker's view.'"[78] Content-based restrictions on speech are valid so long as they are reasonable in light of the purpose of the forum and viewpoint neutral.[79]

The parties conceded that the sheriff's sale is a limited public forum, and the District Court agreed.[80] To the extent that the District Court adopted the definition and legal test applicable to the "nonpublic forum" as outlined by the Supreme Court in *Mansky*, we agree and find the two terms interchangeable for the purpose of a First Amendment forum analysis here. However, to the extent that the District Court applied the test for a "time, place, and manner" restriction to the City's no announcement policy, we will reverse course. The Supreme Court in *Mansky* made a distinction between traditional and designated public forums, where restrictions on the time, place, and manner of speech are subject to certain

---

[76] *Pleasant Grove*, 555 U.S. at 470.

[77] *Mansky*, 138 S. Ct. at 1885.

[78] *Id.* (quoting *Perry Educ. Ass'n. v. Perry Local Educators' Ass'n.*, 460 U.S. 37, 46 (1983)).

[79] *NAACP*, 834 F.3d at 441.

[80] *Porter*, 337 F. Supp. 3d at 547. The City briefly questions whether a forum analysis applies to the sheriff's sale as a "Court-like proceeding," but agrees that if a forum analysis applies that the auction is a limited public forum. City Br. at 22-23, n.5. Although the auction apparently maintains the decorum of a courtroom and is described as similar to a court proceeding, it is not a formal judicial proceeding, and we therefore maintain that a forum analysis applies to the sheriff's sale.

limitations,[81] and the nonpublic forum, where "on the other hand . . . the government has much more flexibility to craft rules limiting speech."[82] The Supreme Court discussed the government's right to "impose reasonable time, place, and manner restrictions on private speech," subject to certain restrictions, only in reference to the traditional and designated public forums.[83] This is consistent with the Court's explanation that the nonpublic forum is subject to "a distinct standard of review . . . because the government, 'no less than a private owner of property,' retains the 'power to preserve the property under its control for the use to which it is lawfully dedicated.'"[84] We therefore decline to apply the three-part test appliable to time, place, and manner restrictions to the nonpublic forum at issue here.

Moreover, the District Court stated that the Sheriff's Office "has no right to forbid an individual with an interest in the property making a short statement as to the individual's interest in the property being offered for sale."[85] We disagree. As the government entity charged with conducting sheriff's sales, the Sheriff's Office has the right to limit speech in accordance with the First Amendment principles applicable to nonpublic forums.[86] During the sheriff's sale, the space utilized

---

[81] A time, place, and manner restriction is reasonable if it: 1) is content-neutral; 2) is narrowly tailored to serve an important government interest; and 3) leaves open ample alternatives for communication of the information. *Galena*, 638 F.3d at 199.

[82] *Mansky*, 138 S. Ct. at 1885 (citations omitted).

[83] *Id*.

[84] *Id*. (quoting *Adderly v. Florida*, 385 U.S. 39, 47 (1966)).

[85] *Porter*, 337 F. Supp. 3d at 547.

[86] Similarly, although the District Court introduced the concept of a forum analysis to the jury at trial, it essentially removed any possibility of the jury's assessing the constitutionality of the City's policy in a limited or nonpublic forum when it instructed the jury that "Mr. Porter had a constitutionally-protected right to speak at the sheriff's sale in order to make the announcement that had been discussed with their attorney," App. 972, and that "the sheriff's office had a policy against announcements," which, "as applied to the plaintiffs at the hearing, was in violation of their

is limited to use by the Sheriff's Office for the exclusive purpose of holding a public auction of foreclosed properties. Because the sheriff's sale is a nonpublic forum, the Sheriff's Office policy prohibiting comments during the auction is valid so long as it is viewpoint neutral and reasonable in light of the City's right "'to preserve the property under its control for the use to which it is lawfully dedicated[:]'" conducting a public auction of foreclosed properties.[87]

## D. First Amendment Analysis of the Sheriff's Office's No Comment Policy

We conclude that the Sheriff's Office's policy prohibiting comments during the sheriff's sale is a reasonable, viewpoint neutral speech restriction aimed at protecting the Sheriff's Office's ability to sell hundreds of foreclosed properties in a single auction.[88] Moreover, any abuse of discretion by Chew in enforcing a clear and non-discriminatory policy prohibiting all comments does not alone give rise to municipal liability.

### 1. Reasonableness

We hold that the policy forbidding public comments during sheriff's sale auctions is a reasonable speech restriction that serves the purpose of the sheriff's sale: the orderly disposition of hundreds of properties in a single auction. Because this is a nonpublic forum, the government is not required to adopt the least restrictive policy nor show that the policy is narrowly tailored to protect a compelling

---

constitutional right to freedom of speech and to petition," App. 973. The City contends that this directed the jury's verdict. We agree.

[87] *Id.*

[88] Our discussion here is focused on the mortgage foreclosure sheriff's sale and the unique circumstances and requirements of such a forum. The specific analysis does not necessarily apply to other types of nonpublic forums. This is particularly true of our discussion of reasonableness. Any analysis of reasonableness must focus on the needs of the speaker to communicate a given message as well as the needs of the forum in which s/he wants to speak.

government's interest.[89] Rather, the government need only "draw a reasonable line" and "be able to articulate some sensible basis for distinguishing what may come in from what must stay out."[90]

During an auction—described as a court-like proceeding—all speech by non-bidders is inherently disruptive.[91] An auction requires a clear and direct line of communication between bidders and the auctioneer in order to complete each sale, especially in a room with hundreds of people. "[T]he interruption of the order of business is itself the disturbance" that the City's policy seeks to avoid.[92] Allowing public comments during the sheriff's sale would threaten the Sheriff's Office's ability to conduct an auction, a proceeding specifically provided for under Pennsylvania law.[93] As the City explains, "public comment or discussion of a property would undoubtedly bog down a sale and cause chaos."[94] The Sheriff's Office therefore prohibits public announcements and further requires an interested person to obtain a court order or present a bankruptcy petition in order to stop a sale.[95] The requirement

---

[89] *NAACP*, 834 F.3d at 441.

[90] *Mansky*, 138 S. Ct. at 1888; *see also NAACP*, 834 F.3d at 441 ("[T]he Government's decision to restrict access . . . need only be *reasonable*; it need not be the most reasonable or the only reasonable limitation") (internal quotation marks and citation omitted).

[91] App. 390-91 (explaining that the sheriff's sale maintains the decorum of a court proceeding).

[92] *Galena*, 638 F.3d at 212.

[93] *See Mansky*, 138 S. Ct. at 1885 ("[T]he government . . . retains the power to preserve the property under its control for the use to which it is lawfully dedicated.") (internal quotation marks and citation omitted).

[94] City Br. at 27-28 n.7; *see also* App. 504-05 (according to Chew's testimony: "Can you imagine if everyone . . . stood up and made an announcement for every one of those properties? It would be chaos.").

[95] Although enforcing the order (and thereby stopping the sale) will generally signal to the public that the property is no longer for sale, this does not convert the order into a public comment or announcement. Even if we were to construe this rule as a content-based restriction (*i.e.* a person with a court

that a property owner take advantage of the available court processes to obtain an order or petition staying or postponing the sale, rather than make unsubstantiated public claims about his or her interest in a property, is a "sensible basis for distinguishing what may come in from what must stay out." Therefore, the City's policy prohibiting public comments during the auction, in the absence of a court order or bankruptcy petition, is a reasonable way to promote the efficient sale of properties by auction. Porter attempted to obtain such an order—several times—and failed.[96] The City's reasonable policy therefore applied to Porter.

The City's policy prohibiting all public announcements is distinguishable from the state statute the Supreme Court found unconstitutional in *Mansky*.[97] There, Minnesota banned voters from wearing any political badges, political buttons, or political insignia inside a polling place on election day.[98] The ban applied to any item "promoting a group with recognizable political views."[99] The Supreme Court found that this law violated the First Amendment right to free speech because it left the word "political" undefined and thereby granted unfettered discretion to election judges to determine what was prohibited.[100] In the Court's view, the "unmoored use of the term 'political' in the Minnesota law" left election officials without "objective, workable standards" to guide their discretion.[101] "A rule whose fair enforcement requires an election judge to maintain a mental index of the platforms and

order or bankruptcy petition may announce that the property is no longer for sale), such restrictions are allowed in a nonpublic forum. *NAACP*, 834 F.3d at 441 (explaining that, in a nonpublic forum, "[c]ontent-based restrictions are valid so long as they are reasonable and viewpoint neutral."). Because the court had denied Porter's repeated motions to stay or postpone the sale, Porter—as well as his attorney and Commerce Bank's attorney (had they been present)—was bound by the policy prohibiting public announcements.

[96] City Br. at 27.

[97] 138 S. Ct. 1876.

[98] *Id.* at 1882.

[99] *Id.* at 1890.

[100] *Id.* at 1888.

[101] *Id*. at 1888, 1891.

positions of every candidate and party on the ballot is not reasonable."[102] Because the "indeterminate prohibition" was not "capable of reasoned application," the restriction "fail[ed] even [the] forgiving test" for reasonableness in a nonpublic forum.[103]

Here, in contrast, there is no issue of an indeterminacy: all public announcements are prohibited. Unlike Minnesota's law that required election judges across the state to individually interpret and apply their own definition of "political," the City's policy does not require the Sheriff's Office to interpret the content of the speaker's message in order to determine if it is allowed. Instead, the policy requires the Sheriff's Office to stop anyone who attempts to make an announcement to the general public regarding the properties (or anything else for that matter). The only discretion involved is determining whether the person has a valid court order or bankruptcy petition staying or postponing the sale, which is not the type of determination that carries the "opportunity for abuse" or creates a subjective, unworkable standard.[104] The City's no comment policy is therefore "capable of reasoned application."[105]

Porter alleges that Chew inconsistently enforced the City's policy, but as we address below, Chew's purportedly selective enforcement does not go towards the reasonableness of the policy itself. Given the City's "flexibility" to craft reasonable limitations on speech that reserve the sheriff's sale for the intended purpose of conducting a public auction, the City's policy meets "this forgiving test."[106]

### 2. Viewpoint Neutrality

Next, we disagree with the District Court's finding that the City's policy prohibiting public comments during the

---

[102] *Id.* at 1889.

[103] *Id*. at 1888, 1891-92.

[104] *Mansky*, 138 S. Ct. at 1891. In fact, this is not a discretionary decision at all. If a court has ordered the sale of the property to be stayed or postponed, the Sheriff's Office must comply.

[105] *Id.* at 1892.

[106] *Id*. at 1885, 1888.

sheriff's sale discriminated based on viewpoint.[107] The District Court reached its conclusion based on "testimony that the organizers of the sheriff's sale tolerated announcements, suggesting that Chew's *implementation* of the policy was viewpoint-discriminatory."[108] Chew testified that whether he allowed an announcement "depends on what [the speaker] wanted to say" and that he was concerned with announcements that "have a chilling effect on the sale itself."[109] The District Court concluded that "Chew thus essentially conceded that the policy, or at least *his application* of it, was not content-neutral, and discriminated on the basis of . . . viewpoint."[110]

This District Court's conclusion fails on two levels. First, as explained above, Porter cannot establish municipal liability under *Monell* absent a policy or custom that violates a person's constitutional rights. The City's policy in this case is clear and uncontested: no comments are allowed.[111] That

---

[107] *Porter*, 337 F. Supp. 3d at 552-53.

[108] *Id.* at 552 (emphasis added).

[109] App. 500. Chew testified that he did not allow announcements that may interfere with a sale or decrease the sale price. According to the City, this is not viewpoint discriminatory since value-decreasing speech is not a "viewpoint." City Br. at 33-34; *see also* Oral Arg. Transcript at 7, 12 (arguing that viewpoint discrimination refers to targeting certain opinions or ideologies, whereas prohibiting speech that discourages sales is an eminently reasonable content-based distinction at an auction). Because we find that the City's official policy prohibited all announcements, regardless of content or viewpoint, we need not delve into the analytical distinction between content and viewpoint discrimination.

[110] *Porter*, 337 F. Supp. 3d at 553 (emphasis added).

[111] The District Court rightly found that "[n]umerous witnesses for both Porter and [the City] confirmed the existence of a policy ostensibly forbidding announcements at sheriff's sales." *Id.* at 552. In discussing the requirements under *Monell*, the District Court also found "that the Sheriff's Department had a specific 'policy' not to allow any 'announcements' to be made at Sheriff's sale" and "the Defendant Sheriff at trial admitted . . . the existence of a policy forbidding announcements at Sheriff's sales." *Id.* at

prohibition applies to all comments, regardless of the viewpoint that is expressed. Consequently, there is no apparent viewpoint discrimination.

Second, the discussion of how Chew implemented or applied the City's policy prohibiting announcements conflates a facial constitutional challenge regarding the City's policy with an as-applied constitutional challenge regarding the enforcement of the policy against Porter.[112] As we have explained, the City's policy prohibiting comments is reasonable and viewpoint neutral on its face, prohibiting all public announcements regardless of the speaker or message. Any facial challenge to the City's policy therefore fails. To the extent we can construe Porter's challenge as an as-applied challenge based on the selective enforcement of the City's policy, this also fails. [113] While Porter may bring an as-applied challenge to a facially constitutional policy, such a challenge remains subject to the constraints of *Monell*.

In *Brown v. City of Pittsburgh*, a woman alleged that a facially valid ordinance creating a protest-free buffer-zone around abortion clinics was unconstitutional as applied to her because the Pittsburgh police were selectively enforcing it against her for expressing her pro-life views.[114] In addressing her *Monell* claim, we explained that: "to establish municipal

---

547. The jury was likewise instructed that the City had a policy forbidding comments. *See supra*, notes 51 and 52 and accompanying text.

[112] *City of Los Angeles v. Patel*, 135 S. Ct. 2443, 2451 (2015) ("Under the most exacting standard the Court has prescribed for facial challenges, a plaintiff must establish that a law is unconstitutional in all of its applications.") (internal citations omitted); *Wash. State Grange v. Wash. State Republican Party*, 552 U.S. 442, 450 (2008) (noting that "[f]acial challenges are disfavored").

[113] *See Thomas v. Chicago Park Dist.,* 534 U.S. 316, 325 (2002) (explaining that a facially constitutional licensing scheme could be unconstitutional as-applied if the licensing agency engaged in a "pattern of unlawful favoritism," such as "[g]ranting waivers to favored speakers (or, more precisely, denying them to disfavored speakers)").

[114] 586 F.3d 263, 289 (3d Cir. 2009).

liability for selective enforcement of a facially viewpoint-and content-neutral regulation, a plaintiff whose evidence consists solely of the incidents of enforcement . . . must establish a pattern of enforcement activity evincing a governmental policy or custom of intentional discrimination on the basis of viewpoint or content."[115] "[O]ne enforcement incident cannot meet the burden of proof imposed by *Monell*."[116] We further clarified that a plaintiff "must prove not merely that the weight of . . . the Ordinance has tended to fall more heavily on those who advocate one viewpoint (e.g., a pro-life view) than on those who advocate another (e.g., a pro-choice view)[,]" but also that "such enforcement occurred *because of* the viewpoint expressed."[117] In other words, a plaintiff must "show an intent to discriminate on the basis of viewpoint" by those enforcing the statute.[118] The plaintiff in *Brown* failed to establish any such "pattern of unlawful favoritism" based on the two times that the police enforced the ordinance against her.[119]

Neither has Porter proved a pattern of unlawful viewpoint discrimination. Even assuming *arguendo* that the Sheriff's Office targeted Porter because of his viewpoint or his previous interactions with the Office on this one occasion, according to *Brown* the City is only liable where it evinces a pattern of intentional viewpoint discrimination. Porter falls short of this exacting standard.[120] The limited and vague testimony regarding instances where the Sheriff's Office permitted announcements is insufficient evidence to demonstrate a long-standing practice or custom of intentionally discriminating based on viewpoint.[121] Unlike the plaintiff in

---

[115] *Id.* at 294.

[116] *Id.* at 296.

[117] *Id.* at 293 (emphasis in the original).

[118] *Id.*

[119] *Id.* at 294-95 (internal quotation marks and citation omitted).

[120] As the District Court correctly notes, "[t]he requirements of a *Monell* claim . . . are very demanding." *Porter*, 337 F. Supp. 3d at 546.

[121] *Jett v. Dallas Ind. Sch. Dist.*, 491 U.S. 701, 737 (1989) (explaining that a municipality is liable for "acquiescence in a longstanding practice or custom which constitutes the standard operating procedure of the local governmental

*Brown*, who could identify a particular political or ideological viewpoint she claimed the city was targeting (pro-life protestors), Porter does not explain what viewpoint the Sheriff's Office was favoring or disfavoring on a consistent basis. Nor does he demonstrate that the supposed inconsistency in the policy's enforcement was backed by an intent to promote or suppress any particular views.[122]

As we have explained, only Porter's claim of municipal liability under *Monell* is before us. Because the City is not strictly liable for the actions of its individual employees, we need not decide whether Chew violated Porter's constitutional rights by targeting Porter because of his message.[123] We do not, of course, condone the manner in which Chew attempted to enforce the City's policy.[124] Nevertheless, the City cannot be

---

entity") (quotation omitted); *see also Bd. of Cty. Comm'rs of Bryan Cty., Okl. v. Brown*, 520 U.S. 397, 404 (1997) ("[A]n act performed pursuant to a 'custom' that has not been formally approved by an appropriate decisionmaker may fairly subject a municipality to liability on the theory that the relevant practice is so widespread as to have the force of law."); *Baloga*, 927 F.3d at 761 (explaining that municipal liability stems only from "a custom . . . though not authorized by law, [that] was so permanent and well settled as to virtually constitute law") (internal quotations and citations omitted).

[122] *Brown*, 586 F.3d at 293-94 (explaining that a disproportionate effect on speakers of a certain viewpoint, because "advocates of a particular viewpoint happen to engage in certain proscribed conduct more than those who espouse other views," does not violate the First Amendment unless the plaintiff proves a discriminatory intent).

[123] As aforementioned, the jury found that Chew retaliated against Porter for exercising his First Amendment right to free speech, but also found that Chew did not cause Porter's injuries. App. 6-7. Porter did not appeal that decision. We therefore consider only the claim against the City in this appeal.

[124] Because the claim against Chew is not before us, we take no position on whether Chew intended for the deputies to use excessive force against Porter, but merely refer to the District Court's conclusion that it was Chew who requested the

held liable under *Monell* based upon Chew's actions without more than appears in this record.

"[T]he First Amendment simply does not require that all members of the public be permitted to voice objections . . . any time they desire to do so."[125] The City has entrusted the Sheriff's Office with establishing a process to facilitate valid foreclosure judgments against property owners. In turn, the Sheriff's Office has elected to sell properties with defaulted mortgages by auction at the sheriff's sale. Efficiently disposing of hundreds of properties via live auction would be ineffective—if not impossible—absent rules limiting the order and manner of speaking. Allowing public announcements by every attendee, involving every lot, would be inherently disruptive to an orderly auction. The City's policy prohibiting public announcements during the sheriff's sale is a reasonable, viewpoint neutral restriction on speech designed to promote the efficient sale of hundreds of foreclosed properties in a single auction. Porter's right to free speech does not encompass the right to disrupt the auction or hinder the intended purpose for which the government has reserved the nonpublic forum.[126] Because we find that Porter fails to state a claim under the First Amendment as a matter of law and therefore reverse the District Court's denial of the City's motion for judgment as a

---

deputies to stop Porter from speaking. *Porter*, 337 F. Supp. 3d at 553 ("Chew apparently asked for such a response.").
[125] *Galena*, 638 F.3d at 212.
[126] *See Mansky*, 138 S. Ct. at 1885 ("The government may reserve such a forum 'for its intended purposes, communicative or otherwise, as long as the regulation on speech is reasonable and not an effort to suppress expression merely because public officials oppose the speaker's view.'") (quoting *Perry*, 460 U.S. at 46); *Startzell v. City of Phila.*, 533 F.3d 183, 198 (3d Cir. 2008) ("The right of free speech does not encompass the right to cause disruption."); *see also Eichenlaub*, 385 F.3d at 281 (ejecting a citizen from city council meeting for disruptive, off-topic speech is not a First Amendment violation because allowing "a speaker to try to hijack the proceedings, or to filibuster them, would impinge on the First Amendment rights of other would-be participants.").

matter of law, we need not reach the issue of the City's motion for new trial.

## V.　　CONCLUSION

Because there is an insufficient basis for a reasonable jury to find that the City of Philadelphia's policy violated the First Amendment, we will reverse the District Court's denial of the City's motion for judgment as a matter of law and dismiss the First Amendment claim against the City.[127]

---

[127] Judge Porter concurs in the judgment.